In re LEBANON STEEL FOUNDRY, Debtor.

AMERICAN BANK AND TRUST CO. OF PA, Plaintiff,

v.

LEBANON STEEL FOUNDRY, Defendant.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff,

v.

LEBANON STEEL FOUNDRY, Defendant.

Bankruptcy No. 1–82–01091.
Adv. Nos. 1–82–0783, 1–82–0767.

United States Bankruptcy Court, M.D. Pennsylvania.

April 12, 1985.

George J. Shoop, Robert H. Kauffman, Rhoda, Stoudt & Bradley, Reading, Pa., Rhoads, Sinon & Hendershot, Harrisburg, Pa., for debtor.

Wolf, Block, Schorr & Solis-Cohen, Michael Temin, Philadelphia, Pa., for Creditors Committee.

MEMORANDUM IN SUPPORT OF ORDER OF FEBRUARY 21, 1985

ROBERT J. WOODSIDE, Bankruptcy Judge.

On February 6, 1985, this court issued a bench order which amended an order dated

May 29, 1984, and had the effect of allowing Lebanon Steel Foundry (Lebanon) to resume operations. The May 29, 1984 order was a stipulated order between American Bank and Trust Co. of Pennsylvania (American) and the Prudential Insurance Co. of America (Prudential) (together Secured Lender) and Lebanon. The stipulated order was a resolution of complaints that had been filed by both American and Prudential to lift the stay and Lebanon's application for the use of cash collateral. Prudential's complaint was filed on December 17, 1982 and American's was filed on December 23, 1982. Lebanon's application was filed on December 27, 1982. Hearings were held on these three matters on January 24, 25, and 28, February 2, 1983 and April 16, 1984. Another hearing was scheduled for May 3, 1984 but was continued and the parties negotiated the stipulated order of May 29, 1984.

The paragraphs of the May 29, 1984 order are summarized as follows:

(1) Lebanon was to prepare and submit to secured lenders a liquidation program of all of its assets.

(2) Lebanon was to forthwith cease taking orders, but could with either court approval or approval of the secured lenders take orders which would be profitable and would not otherwise affect Lebanon's performance under this order.

(3) By July 1, 1984 Lebanon was to cease pouring castings and thereafter only complete work in progress.

(4) Lebanon could not sell any cast or non-cast inventory for less than book value or compromise any account receivable without one of the secured lenders' permission.

(5) All proceeds from whatever source were to be paid to American with the exception of those necessary to conduct business operations under the liquidation program.

(6) Interest was to be paid to the secured lenders monthly at American's prime rate plus 2½%.

(7) By November 30, 1984, Lebanon was to pay $4,500,000 to the secured lenders which amount did not include the interest payable in paragraph 6.

(8) The total indebtedness to the secured lenders was to be paid by December 31, 1984.

(9) Representatives of Coopers and Lybrand as agents of the secured lenders were to continue to have access to the business operations and Lebanon was to reimburse secured lenders for costs of Coopers and Lybrand.

(10) Secured lenders were to continue to have a security interest in all assets of debtors as provided in the prior stipulations and orders for use of cash collateral.

(11) Lebanon could institute incentive programs if approved by the court after notice to secured lenders.

(12) Debtor could continue to use cash collateral as long as it was in compliance with the order and liquidation program.

(13) Debtor retained exclusive rights to file a plan as long as consistent with this order pertaining to payments to the secured lenders.

(14) Debtor was to provide secured lenders, their counsel and Coopers and Lybrand with financial reports and other information as agreed upon.

(15) Secured lenders were to continue to have the right to pursue any remedies under the Bankruptcy Code.

Paragraph 16 of the agreement stated:

(16) Upon failure by the Debtor to timely make payments to the Secured Lenders under Paragraph 7 or 8 hereof, or to timely make the monthly payments pursuant to Paragraph 6 hereof, and upon written certification of such failure given by the Secured Lenders to the Debtor, the Creditors' Committee, through its counsel, and the Bankruptcy Court, the automatic stay imposed by § 362(a) of the Bankruptcy Code shall automatically and immediately terminate and the Debtor shall not interfere with the right of the Secured Lenders to take possession of their collateral, and the Secured Lenders may also proceed with their remedies, at law or in equity, or oth-

erwise, to foreclose, sell and dispose of their collateral free of any interference or restriction of the Debtor or the Bankruptcy Court; and, upon such certification, the Debtor shall be precluded from further using any cash collateral, as defined in § 363(a) of the Bankruptcy Code without the express written consent of the Secured Lenders provided, however, that the Court shall continue to exercise its jurisdiction in the event that the Secured Lenders desire to seek the jurisdiction or assistance of this Court in effectuating the ultimate sale or disposition of their collateral in the future.

Paragraph 16 as set forth in its entirety is the typical "drop dead" provision which secured creditors attempt to assert in stipulated orders in cases involving motions to lift the stay.

On December 24, 1984, Lebanon filed a motion to amend the May 29, 1984 order and to authorize the resumption of Foundry operations and a motion for temporary restraining order and injunction in regard to the use of cash collateral and the automatic stay. These motions were filed by Lebanon on the basis of its determination that it could not comply with paragraph 8 of the May 29, 1984 order which required that the total indebtedness of the secured lenders be paid by December 31, 1984 and its belief that it could resume operations on a profitable basis. A conference was held on these motions on December 27, 1984 and it was agreed that the secured lenders would not file a written certification of default under paragraph 16 until the merits of Lebanon's motions could be heard and disposed of by the court. Lebanon then filed an amended motion to resume Foundry operations. Hearings were held on this amended motion on February 4th and 6th, 1985 which resulted in the bench order of February 6, 1985 amending the order of May 29, 1984 by allowing Lebanon to resume Foundry operations.

The secured lenders filed Notices of Appeal from the "Bench Order" of February 6, 1985 on February 14, 1985. The court then drafted and filed a written order dated February 21, 1985 which substantially contained the terms of the "bench order" of February 6, 1985. This order was docketed to No. 260 and Notices of Appeal were filed from it on February 28, 1985. On March 18, 1985 this court signed an order consolidating the appeals.

The record has been compiled and sent to the District Court, and this memorandum is being written to supply the District Court with the reasoning of the Bankruptcy Judge in amending the order of May 29, 1984 and allowing Lebanon to resume its Foundry operations.

*Discussion*

The issue in this case is whether the debtor should be granted relief from our prior order approving the parties' consent agreement. Bankruptcy Rule 924 incorporates Rule 60 of the Federal Rules of Civil Procedure. This latter rule provides in pertinent part as follows:

Rule 60, Relief from Judgment or Order

(B) On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment order, or proceeding for the following reasons:

. . . . .

(5) ... it is no longer equitable that the judgment should have prospective application.

(6) any other reason justifying relief from the operation of the judgment.

The Prudential Insurance Company argues that no consent decree can be modified absent exceptional circumstances. In support of its position it cites numerous cases in which various courts declined to grant a party's motion for modification. *See,* e.g. *Fox v. United States Department of Housing,* 680 F.2d. 315, 322 (3rd Cir. 1982); *Delaware Valley Citizens Council v. Commonwealth of Pennsylvania,* 674 F.2d 976, 980–82 (3rd Cir.1982). In *Fox,* for example, the Third Circuit held that "in the *usual case* a court *may not impose additional duties* upon a defendant party to a consent decree without an adjudication or admission that the defendant violated

the plaintiff's legal rights ... and that modification is essential to remedy the violations." 680 F.2d at 323. Applying this standard, the court denied the plaintiffs' request to impose upon the Department of. Housing and Urban Development additional terms and duties beyond the scope of the parties' original consent agreement. *Id.* The arguments against allowing parties to readily modify consent decrees are first, that as with all final judgments, the parties have a strong interest in the finality of the decision, and second, that a party should not be relieved from a free, calculated and deliberate choice. *See Ackerman v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 211, 95 L.Ed. 207 (1950); *Fox,* 680 F.2d at 322.

Such a rigid standard, however, is not justified in cases where the court is compelled to invoke its equitable powers to deal with new and unforseen conditions.

■ It is well settled that a court of equity has the power to vacate or otherwise modify its own decrees. *Kelly v. Greer,* 334 F.2d 434, 436 (3rd Cir.1964); *Safe Flight Instrument Corp. v. United Control Corp.* 576 F.2d 1340, 1343 (9th Cir.1978). *Theriault v. Smith,* 519 F.2d 809 (1st Cir.1975). Such modification is particularly appropriate where factual circumstances have changed. Thus, in *System Federation No. 91, Railway Employees Department v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), Justice Harlan, writing for the Court, stated that it is indisputable that "sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of issuance have changed, or new ones have since arisen." *Id.* at 647, 81 S.Ct. at 371, 5 L.Ed.2d at 353.

■ It is also clear that a court of equity has the power to vacate its own orders "whenever such action is appropriate to accomplish justice." *Kelly,* 334 F.2d at 437, citing *Klapprott v. United States,* 335 U.S. 601, 615, 69 S.Ct. 384, 390, 93 L.Ed. 266 (1949). The court's power to modify orders where justice so requires is clearly recognized in Fed.R.Civ.P. 60(b)(5) which authorizes relief where "it is no longer equitable that the judgment should have prospective application." It has been held that a change in factual or legal circumstances may make continued enforcement of an order inequitable within the meaning of Rule 60(b)(5). *Nyberg v. City of Virginia,* 667 F.2d 754, 756 (8th Cir.1982).

■ The duty of the court to invoke its equitable powers is particularly great in those cases where it has assumed responsibility for supervising the continued conduct of the parties in the face of changing conditions. As Justice Cardozo wrote in *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932):

We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent.... Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles *inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.... the distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative....* The result is all one whether the decree has been entered after litigation or by consent.... We reject the argument ... that a decree entered upon consent is to be treated as a contract and not as a judicial act.... [I]n truth what was then adjudged was not a contract as to any one. The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.

*Id.* at 114–15, 52 S.Ct. at 462–63, *Accord, System Federation No. 91, Railway Employees' Dep't.,* 364 U.S. at 646–47, 81 S.Ct. at 370–371, 5 L.Ed.2d 349, 353 (1961); *Jordan v. School District of Erie, Pa.,* 548 F.2d 117, 120–22 (3rd Cir.1977).

Similarly, in *Safe Flight Instrument Corp. v. United Control Corp.* 576 F.2d 1340 (9th Cir.1978) the court, while recognizing that "as a general rule, consent decrees are accorded res judicata effect," carefully pointed out:

> the revision of the decree exacted by the district court in this case was consistent with the familiar distinction between the conclusive res judicata effect properly accorded decrees adjudicating accrued rights and those prospective features of a decree that involves the supervision of changing conduct or conditions and are thus provisional and tentative.

*Id.* at 1344.

■ The power of the bankruptcy court to reconsider and to modify its own orders is indisputable. In the case of *In re Pottasch Brothers, Inc.,* 79 F.2d 613, 616 (2d Cir.1935) Judge Learned Hand referred to the bankruptcy judge's "ancient and elementary power to reconsider his own orders." Judge Learned Hand further stated that there was no reason why a referee's orders "should be as immutable as the Twelve Tables, once the ink is dry." *Id.* As the Court noted in *Matter of Lintz West Side Lumber, Inc.,* 655 F.2d 786 (7th Cir. 1981), "[i]t is now well settled that a bankruptcy judge has the power to reexamine and revise an order which he entered during the pendency of bankruptcy proceedings." *Id.* at 789, *citing In re Meter Maid Industries, Inc.,* 462 F.2d 436 (5th Cir. 1972); *Frasch v. Wilson,* 413 F.2d 69 (9th Cir.1969).

Moreover, in applying Rule 60(b) in a bankruptcy context, the court must keep in mind the unique nature of the bankruptcy proceeding.[1] In the case of *In re Durkalec,* 21 B.R. 618 (Bankr.E.D.Pa.1982) Judge

King recognized that under Rule 60(b)(6) the court should liberally exercise its power to vacate or modify a judgment when necessary to "accomplish justice." Judge King stated:

> In addition, not only does the Bankruptcy Court have the power to vacate a final judgment but also may exercise this power very liberally. The only criteria necessary is to "accomplish justice." Specifically, "Rule 60(b)(6) should be liberally applied to accomplish justice and when a cause is properly within clause (6), the Court has broad legal discretion to grant or deny relief in light of the relevant circumstances...." *In re Ireco Industries, Inc.,* 2 B.R. 76, 84 (Bkrtcy.D. Or.1979). In short, Rule 60(b)(6) is a reservoir of equitable power to do justice in particular cases where relief is warranted. *Matter of Smith,* 3 B.R. 224 (Bkrtcy.E.D.Va.1980). Unquestionably, therefore, it is well within the jurisdictional ambit of the Court to vacate an order or decree which is res judicata."

*Id.* at 619–20. *See also In re Prime, Inc.,* 26 B.R. 556, 559 (W.D.Mo.1983).

In the case of *Johnson and Morgan,* 29 B.R. 372 (Bankr.M.D.Pa.1983), this court adopted the standard set forth in *Durkalec,* noting that "such an approach is particularly necessary and important when reviewing orders issued in a Chapter 11 case which require continuing conduct of the Debtor In Possession and on which the success or failure of the rehabilitation might depend." *Id.* at 374.

■ The facts of this case demonstrate a need for amending the May 29, 1984 order. As previously pointed out the May 29, 1984 order was a liquidation order. It called for Lebanon to cease its operations, liquidate its assets and pay its total indebtedness to the secured lender. There was no indication in the order which assets were to be liquidated to accomplish total payment to the secured lenders. The secured lenders were paid $4,500,000 by November 30, 1984

---

1. The importance of taking into account the peculiar nature of bankruptcy proceedings in applying Rule 60(b) to that setting is well established. *See, e.g., In re Amatex,* 755 F.2d 1034 (3rd Cir.1985); *In re Mason,* 709 F.2d 1313 (9th Cir.1983).

as required in paragraph 7 and this amount was paid without liquidating any land or equipment or machinery. They are presently owed about $2,000,000 in principal.[2]

In January of 1983 the secured lenders presented appraisal evidence to this court of the value of the real estate and the equipment and machinery. The secured lenders' appraisers opined that the value of the real estate was $1,400,000 and that the equipment and machinery on the basis of an orderly liquidation would bring $2,403,-000. At the time this evidence was received the secured lenders were owed approximately $6,500,000.

I have reviewed the testimony of the various appraisers for the secured lenders and the debtor. It is unfortunately predictable in cases of this kind that the appraisers hired by secured creditors will be on the low side while the debtor's appraisal will be on the high side.

Lebanon's equipment and machinery appraiser, James Hudock, an employee of Universal Machinery Equipment Company opined a value of $3,125,800. He accepted the secured lenders' appraisal except for the Foundry equipment. This was his area of expertise. His company was involved in the buying and selling of Foundry equipment and he was familiar with the prices on a daily basis. While the appraiser for the secured lenders was highly qualified, because of the practical familiarity of Lebanon's appraiser with the pricing of Foundry equipment, I lean toward his values. I, therefore, conclude that the equipment and machinery had a value of $3,000,000.

Lebanon's real estate appraiser had considerable experience in the sale of real estate in Lebanon County. However, he never appraised any Foundry or industrial plant close to the size of Lebanon's. The real estate complex involves 29 acres with 18 buildings of various sizes and uses. His value estimate of a little over $5,000,000 was largely based on a cost approach, an approach which in this case does not pro-vide much guidance in determining market value. The secured lenders provided an extensive written appraisal from Paul W. Shoup. He had considerable experience, was highly qualified and his appraisal of $1,400,000 must be given much greater weight than that of Lebanon's appraiser. After reviewing the evidence the court concludes that the real estate had a value of $2,000,000 in early 1983.

While no new evidence of value was introduced in the February 4 and 6, 1985 hearings, the very nature of the assets would indicate that no great fluctuation in value would have occurred between early 1983 and the present. Indeed there was evidence that the Foundry business had improved. Again it must be emphasized that none of Lebanon's equipment and machinery nor real estate had to be sold to pay the $4,500,000 to the secured lenders by November 30, 1984. Thus even if the combined appraisals of the secured lenders of $3,800,000 is accepted their claims are fully secured and more than adequately protected. Moreover, the secured lenders by insisting on strict compliance with the May 29, 1984 order, would require that the stay be lifted and that they be allowed to proceed against all the assets to collect a total debt of only $2,000,000. This of course would jeopardize payment of administrative claims of which there are approximately $500,000 and of unsecured claims. The secured creditors demand for strict adherence to the order is thus not only unnecessary to protect their interest, but, by forcing the company to liquidate would also work an undue hardship on the debtor, its employees and may at the same time greatly and needlessly prejudice many administrative claimants and unsecured creditors.

The evidence discloses that when Lebanon agreed to the order of May 29, 1984 it reasonably believed that it would not have to totally liquidate. The Lebanon officers thought that they could resolve at an early

---

**2.** At the time of the hearing interest payments from Lebanon to the secured lenders was current pursuant to paragraph 6 of the Order. In addition to principal there are other significant costs due the secured lenders.

date the two major problems which precluded Lebanon from getting the infusion of capital necessary to totally pay the secured lenders.

The first major problem was labor. Early in this Chapter 11 case the Union agreed to some wage concessions but only for a fixed time. Thereafter Management and Labor could not achieve any agreement. In August the Union again voted not to accept management's proposals. At this point, Thomas Quinn, Jr. took over the negotiations on behalf of management and an agreement was finally reached when the Union voted its acceptance in December of 1984.

An important concession by the Union was the reduction of labor occupations from 70 to 28. This reduction provides flexibility in work roles. It will allow the supervisors to increase productivity by managing the business more effectively. The agreement runs until March of 1988 and wages only increase 2% per year. There is a significant reduction in vacation and holidays. Also night work is considered normal hourly work so that Lebanon will be able to take advantage of the cheaper electrical energy. Probably the most important part of this agreement is the change in attitude between Labor and Management. There is now a cooperative attitude to try to save Lebanon's business.

The other major problem was the outstanding $16,000,000 claim of the Pension Benefit Guarantee Corporation (PBGC). Until this claim was settled it was extremely difficult to interest financial institutions in providing capital to Lebanon. Despite repeated efforts by counsel, this claim wasn't settled until January 1985. PBGC is to be paid $856,000 as part of a reorganization plan; $500,000 over the next 5 years and thereafter 10% of profits not to exceed 1.6 million for a period of ten years.

Thus Lebanon's two major problems were not resolved until after the time when it was to "drop dead." The only way to pay the secured lenders the $2,000,000 due them by December 31, 1984 was to obtain financing. Lebanon anticipated solving these problems sometime in 1984 and obtaining the necessary financing to pay the secured lenders.

If Lebanon had not been delayed by the unusually long time it took to solve these two major problems and if, accordingly, it was able to enter into negotiations for financial assistance at an earlier date, it may very well have been able to meet its December 31, 1984 "drop dead" deadline. Its failure to meet this deadline is thus based to a large extent on unforeseen and uncontrollable circumstances.

With these two problems behind it, Lebanon has been able to engage in extensive negotiations for financial assistance.

Lebanon has been actively seeking financial assistance so that it can successfully reorganize. The Friday before the February 4, 1985 hearing Lebanon was refused a letter of commitment by a Baltimore bank with which there had been extensive negotiations. Thomas Quinn, III, felt this refusal was precipitated by Lebanon's pushing to have the letter for the February 4, 1985 hearing. On Saturday, February 2, 1985 a number of banks from the Lebanon area met with officials of Lebanon, expressed interest in having the company continue operations and to hold further talks. There have also been extensive negotiations with a company located in Israel and Lebanon appears close to reaching an agreement with that company.

For many years Lebanon has been a premiere producer of armor. For some of these armor products Lebanon is the exclusive supplier in the country. The armor is generally used in tanks.

Lebanon's proposal is to restrict its manufacturing sale to armor. Previously Lebanon operated at a 400 to 500 ton monthly level of production. Although much of the production was unprofitable, the armor production has always been profitable. The present proposal is to produce armor at a 120 tons per month level. Thomas Quinn, III, estimated that this would generate 8.5 million dollars in sales. At the 120 ton level 96 jobs would be

created. The plan is to increase production so that in 5 years the level will be at 360 tons a month generating sales on an annual basis of 21.9 million dollars. At that production rate there will be a need for 340 employees.

Lebanon is the exclusive domestic supplier of Louvered doors for tanks and that business is worth 6.9 million on an annual basis. It is also the exclusive supplier of a gunmount for a new tank for the Army.

The secured lenders strenuously argue that Lebanon should not be allowed to resume operations because they don't have the necessary capital. Lebanon has presented some alternative ways of securing the money necessary to operate. It is anticipated that $200,000 in receivables could be collected. There are also some castings which could be sold. It was also contemplated that a significant amount of equipment and machinery could be sold as could some land which would not be necessary for the pared down operations. Progress billing was also going to be utilized to lessen the need for operating capital. Of course, Lebanon is continuing its negotiations with financial institutions and with the Israel Company. If successful the secured lenders may be paid in full in the near future.

The order of February 6, 1985 amending the May 29, 1984 order of course allows Lebanon to use its cash collateral. There are, however, several reasons for allowing the use of cash collateral and the refusal to have Lebanon "drop dead" on December 31, 1984.

First, the circumstances surrounding Lebanon's operation and its relation with its secured creditors are now considerably different from the ones which existed at the time this Court issued its May 29, 1984 order. Lebanon has paid off $4.5 million dollars of debt to its secured debtors without having to liquidate any of its real estate and equipment. Lebanon has also managed (although belatedly) to eliminate the two problems which most seriously hindered its reorganization efforts. Moreover, I find that the secured lenders are more than adequately protected by the value of the land and equipment and machinery owned by Lebanon. To allow the secured lenders to take over all the assets could result in administrative claimants and unsecured creditors obtaining nothing. Indeed, if I were convinced that Lebanon could not successfully reorganize, an appropriate order would be a conversion to a Chapter 7 for an orderly liquidation.

While the secured lenders might eventually prove to be right that Lebanon will not be able to successfully reorganize, under the facts as presented it makes no sense not to give Lebanon the opportunity to try.

The facts of this case demonstrate the need to allow a bankruptcy court to review its order by a less stringent standard than some of the cases cited by the secured lenders. Under this standard, the May 29, 1984 order must be amended. Even if the stringent standards are applicable, the totality of circumstances in this case including Lebanon's uncontrollable delay in obtaining financing, the extreme and, at least at this time, unnecessary hardship which forced liquidation would impose on the debtor, the needless harm which forced liquidation would impose on Lebanon's other creditors and Lebanon's apparent current ability to successfully resume operations and to pay off its creditors in full give rise to unusual circumstances which require an amendment to the May 29, 1984 order.