In the Matter of **KEYSTONE CAMERA PRODUCTS CORPORATION, a Delaware Corporation, and Keystone Camera Corporation, a Delaware Corporation, Debtors.**

**Bankruptcy Nos. 91–20381, 91–20382.**

United States Bankruptcy Court, D. New Jersey.

April 15, 1991.

Ravin, Greenberg & Marks, Roseland, N.J. by Larry Lesnik, for debtors.

Spector Gadon & Rosen, Camden, N.J. by Alan S. Fellheimer, Special Counsel, for debtors.

Cole, Schotz, Bernstein, Meisel & Forman, Hackensack, N.J. by Michael D. Sirota, for Unsecured Creditors Committee.

Hannoch Weisman, Trenton, N.J. by Simon Kimmelman, and Otterberg, Steindler, Houston & Rosen, New York City by Richard Rubin and Jonathan N. Helfat, for Congress Financial Corp.

## OPINION

WILLIAM F. TUOHEY, Bankruptcy Judge.

This matter came before the court in connection with two motions. Initially, the Unsecured Creditors' Committee moved before the court to convert the pending chapter 11 proceedings to a chapter 7 liquidation or, in the alternative, to appoint a chapter 11 operating trustee. In addition, Congress Financial Corporation moved before the court to vacate the stay to allow said financial institution to reclaim its collateral consisting of inventory, machinery and equipment and accounts receivable, all belonging to the debtor.

On the return date of the above two motions, debtor, through special counsel, rose and stated to the court that the debtor had available in court a proposed lender who would finance the debtor to the extent of two million dollars in exchange for a super-priority position that would prime Congress Financial. Because of the emergent nature of debtor's application the court granted the debtor the extraordinary relief of commencing the hearing forthwith. The hearing has continued for four days. All of the issues raised in the three matters before the court, namely, conversion, vacate stay, and the debtor's obtaining of credit pursuant to Bankruptcy Code § 364, are all core proceedings as defined by Congress in 28 U.S.Code § 157.

## FINDINGS OF FACT

Based upon the exhibits placed in evidence, and after having considered the testimony of all of the witnesses and having given due regard to their disposition and demeanor, the court makes the following findings.

1. The debtors herein filed two separate chapter 11 petitions on January 28, 1991. The matters have been procedurally consolidated by orders of this court. The consolidated debtors operate a factory in Clifton, New Jersey, from which they manufacture certain cameras and other camera equipment.

2. In February of 1991, after the commencement of the chapter 11, debtor asserts that it still was employing approximately 400 individuals. Debtor ceased all operations on March 29, 1991, and furloughed all of its employees. On the same date the public utilities companies ceased service to debtor for non-payment of D.I.P. utility service bills.

3. Based upon the testimony of Stephen Atlas of Penn Bank Shares, it is proposed that the debtor will borrow the sum of $2,000,000 based upon a demand note loan. Mr. Atlas has advised the court that the interest rate of said obligation would be 13% and that his company, Penn Bank, would charge an origination fee of $40,000. In addition, a requirement of the loan would be that Mr. Atlas would be hired as an investment banking consultant by the debtor at the rate of $10,000 per month. Included in the loan package would be the right of Penn Bank Shares to have a right of first refusal on any reorganization plan filed by the debtor or any third party, as well as any attempt to sell the debtor's assets in bulk.

4. Mr. Atlas further testified that his advancement of $2,000,000 was strictly contingent upon the two million dollar loan being granted a super-priority status pursuant to Bankruptcy Code § 364. Essential to the granting of this super-priority status would be a priming or placing of the Penn Bank Shares' $2,000,000 obligation ahead of the current Congress Financial obligation of approximately $3.7 million.[1]

5. The net result of the proposed loan transaction put forth by the debtor through Penn Bank Shares would be to increase the secured loan on debtor's inventory, accounts receivable and machinery and equipment from the current sum of approximately $3.7 million held by Congress to a total of $5.7 million. In addition, Congress would be subordinate to Penn Bank Shares.

6. Debtor has accumulated very substantial debtor-in-possession obligations which must be paid before debtor can consider reopening. It is undisputed that the debtor owes withholding and salary payments to its employees amounting to $249,000, as well as rent and utility charges, and pass-through charges under its primary lease of $200,000. In the testimony before the court, it has been estimated that in order to reopen its doors, of the $2,000,000 cash advance, the initial sum of between $500,000 and $800,000 will be used to pay the necessary, unpaid, debtor-in-possession obligations. These bills must be paid before debtor's employees will return to work and the debtor will be able to reopen its business premises in Clifton, New Jersey, and obtain utility services. Thus, out of the two million dollar advance the debtor will have remaining $1.5 to $1.2 million dollars for operating capital.[2]

7. The business history of the debtor since 1988, as testified by Linda Helbig, discloses that in 1988 the debtor operated at a twenty million dollar loss; in 1989 the debtor operated at four million dollar loss; and in 1990, based on gross sales of $37,000,000, the debtor operated at a ten million dollar loss. In summary, in the three year period 1988 through 1990, the debtor lost thirty-four million dollars. The court particularly notes that Ms. Helbig, the chief financial officer, and Mr. Myron Berman, chief executive officer, are in agree-

---

1. While Mr. Atlas testified as indicated, counsel for the debtor has stated Penn Bank only seeks to prime Congress on the accounts receivable.

2. February operating report, D–5, reflects one month's payroll and taxes as shown on lines 7, 8 and 9 of $702,290.00.

ment that the two million dollar advance will not be sufficient and is only a short term cure to debtor's problems. Debtor's two chief witnesses, Ms. Helbig and Mr. Berman, further testified that debtor's current, immediate cash flow problem arose through a substantial offset and credit taken by one of its principal customers, Wal–Mart. Apparently, as testified to by said parties, the debtor had an outstanding account receivable of approximately $780,000. In March of 1991, the debtor received a check from Wal–Mart in the amount of approximately $60,000. This check reflected a $500,000 deduction by Wal–Mart as a credit for returned merchandise and an additional $220,000 advertising credit for an advertising adjustment arising in 1988. Thus, approximately $720,000 was deducted or offset by Wal–Mart from this substantial account receivable.

8. It was further testified that management's investigation disclosed that the Wal–Mart returns took place between October, 1990, and January, 1991, with a substantial amount of said returns having occurred in 1990. Mr. Berman testified before this court that he worked for eleven years at the Chase bank in New York and, in addition, after that worked for eight years as a real estate investor. Mr. Berman is an attorney and for some years practiced law in the State of New York. In education and in demeanor the court found Mr. Berman to be a sophisticated business person. Yet, this sophisticated business person was not able to tell the court the current ageing of his inventory. In addition, Mr. Berman did not know how much of his inventory was represented by the new 35mm camera line. Further, Mr. Berman testified that he had not made efforts to obtain or read the mail coming into his corporation on a daily basis since the corporation shut its doors on March 29th. In addition, Mr. Berman has not pursued collection efforts on five million dollars in outstanding accounts receivable in any substantial way since two or three days following the shut down of the premises. In this regard, the court notes Mr. Berman's testimony that he has not contacted United Jersey Bank wherein the debtor has a lock-box in which all of its accounts receivable returns are deposited and ultimately forwarded to Congress Financial. Since the filing of the chapter 11, Mr. Berman advised the court, under oath, he has not pursued the current balances in said account for an accounting or other investigation.

9. The court further finds that the upper levels of management of Keystone, in December of 1990 when the last physical inventory was taken at the factory, became aware of an approximate $500,000 increase in the value of the inventory. This increase would have resulted from the Wal–Mart returns; and, in addition, this court finds that this substantial change in debtor's inventory base was not reported to Congress Financial until March of 1991. It is noted, based on the testimony before the court and the financing documents between the debtor and Congress, that this change in inventory would have had an adverse impact on debtor's ability to draw down funds from Congress. The entire loan document history between Congress and the debtors has been set forth in a thirty-three exhibit packet submitted initially by Congress to the court in connection with its application to vacate stay. The parties have stipulated that said thirty-three exhibit document is properly before the court and does accurately reflect the loan documents. As of the date of the filing of the chapter 11 petitions, Congress Financial was owed $4.5 million.

10. The day after the chapter 11 proceeding was commenced, at 2:00 p.m. on January 29th, Congress and the debtor appeared before the court for an emergent cash collateral application. The debtor was granted certain emergency uses to keep its doors open, and a formal cash collateral hearing was scheduled for January 31st. A transcript of the January 31st hearing is on file in the debtor's chapter 11 docket and reflects that on said date the debtor and Congress placed upon the record the terms of a formal agreement which would allow the debtor to obtain a $500,000 cash advance from Congress and to continue to use accounts receivable proceeds on a mod-

ified formula. Mr. Berman, the principal of the debtor, was in court on January 31st and consented and agreed to the consent order. Ultimately, the parties formally submitted a written consent order to the court which memorialized the transcript of January 31st. That consent order was executed by the court on February 12th and was modified to the extent of certain points raised by the unsecured creditors' committee by a subsequent cash collateral order entered several days later, on February 27, 1991.

11. It is undisputed that, operating under the cash collateral order during the chapter 11, Congress made advances to the debtor totalling approximately $1,800,000. It is also undisputed that the advances made by Congress during the chapter 11 have been repaid by the debtor through proceeds deposited in the accounts receivable lockbox. The net result is that, while Congress was owed $4.5 million on day the chapter 11 proceeding was commenced, at the time of the hearing before the court the Congress debt has been reduced to $3.7 million.

12. The parties have stipulated into evidence two appraisals. D–12 is an exhibit consisting of an appraisal by Daly–Hodkin which reflects debtor's machinery and equipment having a liquidation value of $1,287,000. In addition, exhibit D–13 is a Daly–Hodkin inventory and appraisal reflecting that at liquidation values the debtor's finished inventory value of $816,000, and at liquidation value the debtor's parts inventory has a value of $144,000. Thus, in summary, debtor's inventory at liquidation has a value of $960,000. Thus, at liquidation values the machinery, equipment and inventory, as set forth in the Daly–Hodkin appraisals, is $2,247,000.

13. The court notes that the debtor calls the court's attention to the fair market value figures set forth in exhibit D–13, the inventory and appraisal, and that said market value inventory numbers total $4,897,-000.

14. The third piece of the collateral package held by Congress consists of the remaining accounts receivable. Exhibit D–11 in evidence, taken from the computer data of Congress, discloses that debtor has total accounts receivable outstanding of $5,891,000; however, of these receivables, $2,734,000 are ineligible receivables that were either not pre-credit approved by Congress or were old and stale. Exhibit D–11 would reflect that the debtor currently has $3,157,000 in current or prime receivables.

15. The testimony of Mr. Edwin Stern, senior vice-president of Congress is that the available or current accounts receivable number of $3,157,000 must be adjusted for a dilution factor. Mr. Stern testified that this dilution factor represents adjustments and credits taken by the party who is obliged to pay the debt once they learn that a company is shut down and out of business. The debtor's historic dilution record for the period 1989 through 1990, as testified by Mr. Stern, was a 17–22% factor. In addition, Mr. Stern testified that in February of 1991, because of its cash flow problems, the debtor suffered a 30–40% dilution factor. This dilution, or difference between gross invoices or sales and actual collections, is reflected in the lengthy testimony of debtor's two principal officers involving the Wal–Mart account receivable which was diluted to the extent of some 90%.

16. On the subject of dilution, the court notes that Mr. Berman himself testified that currently Keystone provides a five year guaranty or warranty on its cameras, and he conceded that if the company was out of business the wholesale purchasers of the cameras, such as K–Mart, Walmart, etc., would in all likelihood take a discount from the outstanding accounts receivable to cover themselves for possible exposure to future warranty claims.

17. Based on all of the above, the court feels that it is reasonable to assume a minimum of a 20% dilution factor from the $3,157,000 accounts receivable. This results in a $600,000 adjustment and brings the outstanding accounts receivable balance down to the sum of $2,557,000. Thus, the machinery and equipment, as well as inventory and accounts receivable adjusted balance, show a total liquidation value of

$4,804,000. This is the collateral base securing Congress' outstanding loan of $3.7 million. It is on this collateral base that the debtor would seek to impose an additional two million dollar loan ahead of Congress.[3]

18. The court has reviewed in depth the cash collateral order of February 12, 1991, as well as the hearing held on January 31st in connection therewith. The court notes that, on page 8, the cash collateral order of February 12th clearly states that it refers to itself as involving post-petition loans. Page 9 of the order states that it will remain in place only until May 31, 1991, and thus is a temporary financing arrangement for the debtor. Page 10 of the cash collateral order of February 12th expressly refers to the fact that pre- and post-petition debts were being granted a super-priority lien. On page 13 the order makes reference to a one-time $500,000 advance being made by Congress to Keystone; and finally on page 22, the February 12th order expressly refers to the loan not being primed by further borrowings.

## CONCLUSIONS OF LAW

■ Congress strongly objects to the granting of the proposed two million dollar super-priority loan which would prime Congress. Congress states that it is entitled to rely upon the initial cash collateral order entered in this case on February 12, 1991, and that it would be improper for this court to modify said order and in any way prime Congress' loan. The court notes that cross-collateralization of pre- and post-chapter 11 filing debt is only a valid exercise if, at the time of the entry of the cash collateral order, a new loan to the debtor otherwise unobtainable is being advanced by the lender. In the matter before the court there was a $500,000 advance set forth by Congress, and thus the super-priority lien granted to Congress meets the test of bankruptcy case law.

3. Even restricting the priming of Congress' loan to the accounts receivable portion places Congress at peril. The prime collateral for Congress would be equipment and inventory having

■ The debtor strenuously argues that there has been an improvement in Congress' position since the entry of the original cash collateral order and, in fact, not only has the $500,000 advance been repaid, but there have been other substantial accounts receivable collection payments to Congress so that Congress' loan balance has been reduced by $800,000 during the early days of this chapter 11. Said facts are accurate and are assumed by this court in this opinion. Having said that, the debtor refers this court to *In re Lebanon Steel Foundry*, 48 B.R. 520 (Bankr.M.D.Pa. 1985). Debtor argues that *Lebanon Steel* and the cases cited therein provide ample grounds to modify the prior cash collateral order and allow the new two million dollar financing, and further allow the debtor to prime the Congress financing. While it is true that the *In re Lebanon Steel* case, *supra*, does indeed recognize that the bankruptcy court, as a court of equity, has the right to revisit prior orders entered in a case, the *Lebanon* court is quick to note that such a modification is particularly appropriate where the factual circumstances before the court have changed. *Lebanon, supra*, page 523.

To accept the debtor's argument, which is grounded in the *Lebanon Steel* case, it is necessary to look at the changes in the factual and legal circumstances involving the debtor's case in some detail. Debtor points to the reduction in the outstanding balance owed to Congress and states that this is justification for modification of the cash collateral order. However, there have been other substantial changes in the facts of the case since the entry of the cash collateral order:

1. The debtor's doors are currently closed.
2. All of debtor's employees are currently on furlough.
3. The debtor has zero cash in the bank.
4. The debtor has outstanding debtor-in-possession obligations involving the following:

a liquidation value of $2,247,000. The remaining loan balance of approximately $1,000,000 would be primed by Penn Bank's two million dollar advance.

a) $715,000 (exhibit D–3, page 4).

b) $130,000 wage deferral as testified to by Ms. Helbig.

c) $2000 in trade debt as testified to by Ms. Helbig. Total: $847,000 open DIP debt.

5. Accounts receivable may have collection problems due to the open issue involving five year warranty as referred to by Mr. Berman in his testimony.

A balancing of the positive and negative changes in the factual and legal circumstances that have arisen since the entry of the cash collateral order cause this court to conclude, applying the case of *In re Lebanon Steel* and the test set forth therein, that the accounts receivable order should stand as the order of the case and that the provisions set forth therein which bar a priming of the Congress lien should prevail.

However, because this matter involves the future and jobs of 400 people and their families, this court has entered into a more substantive analysis and has put the parties to all of their proofs on the debtor's collateral base and further on the full nature and extent of the debtor's current cash position. The court, for the purposes of this analysis, is assuming that the debtor's argument is correct and that the cash collateral order could be modified and the Congress lien, in theory, could be primed. The result of said analysis follows.

■ Even if the court assumes that Congress' loan could be primed, the most fundamental question is, does Congress have adequate protection today based on its collateral base? If there is insufficient equity in the collateral base so as to grant a priming lien above Congress and yet protect Congress, this court's review should go no further. Thus, this court must determine if there is any equity cushion which would allow Congress' loan to be primed.

The debtor argues strenuously that in evaluating Congress' position this court must use going concern values. The debtor argues that exhibit D–11, taken from Congress' records, would reflect accounts receivable balance of $5.8 million. In addition, the debtor argues, exhibit D–13, the inventory appraisal, must be looked at insofar as it reflects fair market values so that the debtor would assert $4,897,000 in inventory value at fair market. In addition, the debtor would include the machinery and equipment at $1,287,000. Thus debtor would assert, in summary, $5,891,000 in accounts receivable; $4,897,000 in inventory; and $1,287,000 in machinery and equipment, for a total collateral base of $12,075,000. Using these numbers, debtor argues that there is adequate protection for Congress and that its loan should be primed.

Bankruptcy Code § 506(a) states that an allowed claim which is secured by a lien on property of the debtor by a creditor that has an interest in said estate is a secured claim so long as the amount of the claim is exceeded by the value of the collateral. It is undisputed, based upon either the debtor's collateral numbers or Congress' liquidation values, that Congress is a secured creditor under the provisions of § 506 of the Code. It is noted that Bankruptcy Code § 506(b) further provides that the amount of a claim shall be determined as of the date of the filing of the bankruptcy petition. The value of the property should also be determined as of the petition date. *Matter of Kennedy Mortgage Co.,* 23 B.R. 466 (Bankr.D.N.J.1982); *In re Beard,* 108 B.R. 322, 19 B.C.D. 1801 (Bankr.N.D.Ala. 1989).

If the value of the property before the court is less than the amount of the asserted claim, the claim is unsecured. If the value of the property is greater than the amount of the claim, the claim is thus over-secured. The amount of the secured claim is the entire amount due on the petition date plus post-petition interest and expenses accruing under Bankruptcy Code § 506. *United States v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

■ A secured creditor has a constitutional right to have the value of its secured claim on the petition date preserved. *Wright v. Union Central Life Insurance*

*Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940).

In determining whether there is an excess of security so as to constitute a cushion, it is necessary to determine whether the court values the collateral on a going concern value or on a liquidation value. This fact was expressly noted by Congress in the congressional history when the Bankruptcy Code was adopted.

> In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case.

Sen.Rep. No. 989, 95th Cong. 2nd Sess. (1978); H.R.Rep. No. 595, 95th Cong. 1st Sess. 339 (1977), U.S.Code Cong. & Admin. News 1978, p. 5787.

▪ The bankruptcy court has considerable discretion in determining the appropriate method of valuation when faced with issues such as those before this court. Weintraub and Resnick *Bankruptcy Law Manual* (1980) § 5.11(1) at 5–39. It has been held that the value ascribed to collateral before the bankruptcy court should be the value that the secured creditor is likely to realize if it obtained possession of the collateral and moved forward with a commercially reasonable liquidation under commercially practical and reasonable circumstances. *In re American Kitchen Foods, Inc.* 2 B.C.D. 715 (Bankr.D.Me.1976).

▪ In summary, if the court determines in balancing the equities that there is a reasonable likelihood that the debtor will successfully reorganize, the going concern values may be used cautiously by the court to justify additional loans to the debtor-in-possession. However, in entering into this area the court must satisfy itself that the specific facts before the court lead to the conclusion that there is a greater likelihood of success in reorganization than there is in liquidation. Such an analysis, insofar as it goes to the essential property rights of the secured lender, must be undertaken with great care and deliberation by the court. What is particularly disturbing in the matter before me this date is that, on the one hand there are 400 jobs and the future of 400 families, as well as the substantial interests of the equity owners of this business, all of which are asking this court to conclude that there is a substantial likelihood of reorganization so as to justify the use of going concern values. On the other hand there are the secured and unsecured creditors asserting their property rights and stating to this court that they are at great risk and peril, and that if this court liquidates this proceeding at this time the secured creditors will, in all likelihood, be paid in full and, in fact, there is a relatively substantial dividend that will flow to the unsecured creditors. Thus, this court's determination of whether to use liquidation values or going concern values on debtor's collateral base is most fundamental, and from this decision the respective rights of the various parties will rise or fall.

In reaching this determination the court has reviewed exhibit D–5 in evidence, which is the operating report filed by the debtor with the office of the United States Trustee and reflects debtor's operations from January 28th through the end of February 1991. Said report reflects that the debtor had total cash receipts for that period of $1,415,890 and that the debtor expended $1,415,886, leaving a $4 bank balance at the conclusion of that period. In addition, the report would reflect that the three bank accounts of the debtor, basically the operating account, the payroll account and the tax account, when consolidated, resulted in a negative cash balance of $2,089, as is reflected in line 16 of exhibit D–5 in evidence. In addition, the report would disclose on line 21 that the debtor had unpaid trade debt of $318,603. The testimony before the court reflects that said unpaid obligations have now accrued to the point where debtor owes in excess of $800,000 in unpaid debtor-in-possession bills. The debtor's premises have now been closed for over two weeks and all of its employees have been furloughed. The debtor's factory has been dark and is without electricity or other essential services.

■ The court notes that in determining the possible success or failure of the reorganization effort the court is free to consider the quality of current management. While both Mr. Berman, the chief executive officer, and Ms. Helbig, the chief financial officer, appear to be sincere in their enthusiasm for this company, the court cannot ignore that, placed on the stand under oath, Mr. Berman could not advise the court as to the current ageing of his physical inventory, did not know what percentage of his physical inventory comprised the newer and thus more valuable 35mm camera inventory, and that he advised this court he was not reviewing his mail or attempting to pursue account receivable collection efforts. The debtor came to court in these proceedings with the essential job of convincing the trier of the fact that the accounts receivable base and debtor's inventory were of such substantial value so as to justify an additional loan advance over and above the Congress balance. In coming to court debtor has not in its case produced an accounts receivable ageing, has not produced an updated inventory figure[4] and has not apparently taken the most fundamental business steps necessary to prove the necessary facts to the court.

A great deal of testimony before this court has centered around the ten or twelve major accounts which comprise the core or key to debtor's accounts receivable balance. Throughout the four days of these hearings no effort has been made by the debtor to produce simple confirmations of accounts receivable balances from these ten or twelve substantial creditors. The debtor's failure to do this can only result in negative inferences being taken by the trier of fact. Those negative inferences only support the position of Congress that the account receivable balance of $5,891,000, as reflected in exhibit D–11, must be adjusted for older and ineligible receivables so that the true accounts receivable balance is $3,157,000, and that this number must further be reduced for the dilution factor as previously set forth herein.

The court expressly notes that the two million dollar loan placed before the court is not sufficient to carry the debtor forward on a permanent basis. Debtor's principal witnesses confirmed said fact. This is a short term loan by which the debtor hopes to remain alive and obtain more permanent additional financing. To state this fact is to acknowledge the risky future the debtor faces even with the aforesaid two million dollar loan.[5] If we allow this loan to go forward and the debtor should fail in 90 days, where will the case stand? The secured loan balance will have increased from $3.7 million, where it currently stands, to the sum of $5.7 million. That entire $5.7 million would consist of a super-priority lien to both Congress and the new lender. That super-priority lien would prime all other debts and obligations and administration expenses. This priming would thus cause any balances for unpaid wages and benefits owed to employees to also be primed. The court notes that, pursuant to Bankruptcy Code § 507, the employees have certain protection up to the extent of $2,000 under the provisions of the Bankruptcy Code; if the case is currently liquidated, since there is an excess of funds that will be available over and above the secured collateral base, the employees will receive the protection of the § 507 wage priority. If we add this additional layer of super-priority debt, the employee's right to this $2,000 protection per employee will be in doubt.

■ For all of the aforesaid reasons the court concludes that, based upon the enormous losses suffered over the past three years by the debtor, and further based upon the debtor's premises currently being closed and having been closed for two weeks, and the very substantial amount of unpaid debtor-in-possession obligations that would have to be paid in order to reopen,

4. The court notes on the fourth day of trial, after a demand from Congress, the debtor placed on counsel table what it alleges are these records.

5. The court notes that days after the February 12th cash collateral order Congress wired the debtor $500,000, and by March 29th the debtor was out of funds, its employees on furlough and the utilities shut off.

all cause this court to conclude that the proposed two million dollar loan would not be sufficient to, in any way, assure on a reasonable basis that this debtor is likely to be successfully reorganized. Quite simply put, there are not sufficient funds being invested so as to give this debtor any reasonable likelihood of reorganization.

Therefore, this court has no discretion and must conclude that there is not a reasonable chance of reorganization and that, in evaluating the collateral base so as to justify the entry of the within loan, forced sale values as opposed to going concern values should be utilized. Upon applying said forced sale values, this court is forced to conclude that there is not sufficient equity so as to justify the $3.7 million current balance plus the additional two million dollar super-priority loan. There is not sufficient equity to prime Congress' loan. Since the advance set forth is contingent upon priming Congress, the court will not approve the proposed two million dollar loan.

Thus, debtor's emergent motion is denied and the loan is disapproved. This leaves the court with an unoperating debtor with zero account balance and open debtor-in-possession bills in excess of $800,000. The committee's motion to convert the matter to chapter 7 is granted. Congress' motion to vacate the stay is granted in part so that the current accounts receivable will be surrendered by the chapter 7 trustee to Congress for further collection; Congress is to file weekly reports with the chapter 7 trustee reflecting amounts collected and names of the accounts collected. The remaining portion of the collateral base, namely, machinery, equipment and inventory, will remain under the custody of the chapter 7 trustee subject to the rights of Congress and subject to further order of this court.