SYSTEM FEDERATION NO. 91, RAILWAY
EMPLOYES' DEPARTMENT, AFL–CIO,
ET AL. *v.* WRIGHT ET AL.

No. 48.   Argued December 5, 1960.—Decided January 16, 1961.

*Richard R. Lyman* argued the cause for petitioners.
With him on the brief was *Robert E. Hogan.*

*Marshall P. Eldred* argued the cause for respondents
and filed a brief for respondents other than Louisville &

Nashville Railroad Co. *John P. Sandidge, H. G. Breetz, W. L. Grubbs, M. D. Jones* and *Joseph L. Lenihan* filed a brief for Louisville & Nashville Railroad Co., respondent.

MR. JUSTICE HARLAN delivered the opinion of the Court.

By a complaint filed on July 16, 1945, in the United States District Court for the Western District of Kentucky, 28 nonunion employees of the Louisville and Nashville Railroad began an action for declaratory relief, an injunction, and damages against the railroad and a number. of unions representing its employees. Particularly relevant to the complaint were those provisions of the fourth and fifth paragraphs of § 2 of the Railway Labor Act [1] which make it

> "unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . ."

and which forbid any carrier from requiring "any person seeking employment to sign any contract or agreement promising to join . . . a labor organization . . . ." Also relied upon was the duty of the exclusive bargaining agent to represent fairly and without discrimination all members of the class represented. See *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192. The factual allegations set forth a pattern of discriminations effected by the railroad and the defendant unions against nonunion employees.

---

[1] 45 U. S. C. § 152.

By a settlement agreement dated December 1, 1945, the 28 plaintiffs released the railroad and union defendants from all claims [2] or actions then accrued "in consideration of the sum of $5000.00 this day paid to the undersigned . . . and the consent of said defendants to the entry of a decree in said action, a copy of which is attached hereto . . . ." The attached decree was adopted by the District Court on December 7, 1945. After detailing and then enjoining a number of specific discriminations on the basis of union status, the decree provided that the defendants

> "are further enjoined, in the application of the provisions of the regularly adopted bargaining agreements in effect between the defendant Railroad and the defendant Unions, or that may be hereafter in effect between the defendant Railroad and the defendant Unions in accordance with the provisions of the Railway Labor Act, from discriminating against the plaintiffs and the classes represented by them in this action by reason of or on account of the refusal of said employes to join or retain their membership in any of defendant labor organizations, or any labor organization . . . ."

The District Court retained jurisdiction over the matter "for the purpose of entering such further orders as may be deemed necessary or proper."

In 1951 the Railway Labor Act was amended to permit, under certain circumstances, a contract requiring a union shop.[3] In order to avail themselves of the newly granted statutory privilege, in 1957 the petitioners filed in the District Court a motion under Rule 60 (b) of the Federal

---

[2] Each of the 28 plaintiffs had claimed $5,000 in damages.

[3] 45 U. S. C. § 152 Eleventh. See *Railway Employes' Department* v. *Hanson*, 351 U. S. 225.

Rules of Civil Procedure [4] asking for a sufficient modification of the consent decree to make clear that it

> "shall have no prospective application to prohibit defendants, or any of them, from negotiating, entering into, or applying and enforcing, any agreement or agreements authorized by Section 2, Eleventh, of the Railway Labor Act, as amended January 10, 1951."

The motion, which was opposed by the railroad and its suing employees (respondents here), was denied after a hearing at which was presented unrebutted evidence of assaults, destruction of property, and various other malicious acts directed by members of the union at any employee (union or nonunion) who had worked during a 58-day strike in 1955. The District Court acknowledged its authority to modify the consent decree but declined to do so, primarily out of regard for the fact that the unions (petitioners here) had consented by the decree not to have a union shop then or in the future, an undertaking which the District Court considered was not unlawful either before or after the 1951 amendments.[5] The court stated:

> "It is to be remembered that the provisions of the Railway Labor Act made illegal a union shop in 1945, when the injunction was agreed upon. Hence, it was then unnecessary for the railroad and the unions

---

[4] The relevant provisions of Rule 60 (b) are as follows: "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . . (5) . . . it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

[5] In the view we take of the case we need not consider whether such a commitment of indefinite duration is valid.

to agree, as they did, that the non-union members should not then be required to join or maintain membership in any of their craft unions as a condition precedent to employment. The law so prohibited, Section 152, Fourth and Fifth, Title 45, United States Code Annotated, Railway Labor Act. The railroad and unions went further to provide by their agreement that no such requirement of union membership should thereafter be in effect in any bargaining agreement in accordance with the provisions of the Railway Labor Act. The 1951 amendment to the Act did no more than make negotiations for a union shop permissive, Railway Employees' Dept. v. Hanson, supra. The amendment did not nullify the agreement or the injunction. It did not prohibit an agreement between the railroad and the unions that a union shop should not exist. Hence, the Court leaves the parties as they agreed to be and to remain." 165 F. Supp. 443, 449.

Though making it clear that evidence of continued union hostility against nonunion employees was not decisive, the District Court gave some weight to the administrative difficulty of preventing unlawful discriminations against nonunion employees that might be facilitated if there were a union shop. The Sixth Circuit affirmed "for the reasons set forth in the opinion of Chief Judge Shelbourne" in the District Court. 272 F. 2d 56, 58. We granted certiorari because of the importance of the issues involved. 362 U. S. 948.

At the outset it should be noted that the *power* of the District Court to modify this decree is not drawn in question. That proposition indeed could not well be disputed. See *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421; *United States* v. *Swift & Co.,* 286 U. S. 106;

*Chrysler Corp.* v. *United States,* 316 U. S. 556. In the *Swift* case, Mr. Justice Cardozo put the matter thus, at 114:

> "We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent. . . . Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. *Ladner* v. *Siegel,* 298 Pa. St. 487, 494, 495."

There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief. Firmness and stability must no doubt be attributed to continuing injunctive relief based on adjudicated facts and law, and neither the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided. Nevertheless the court cannot be required to disregard significant changes in law or facts if it is "satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *United States* v. *Swift & Co., supra,* at 114–115. A balance must thus be struck between the policies of *res judicata* and the right

of the court to apply modified measures to changed circumstances.

Where there is such a balance of imponderables there must be wide discretion in the District Court. But discretion is never without limits and these limits are often far clearer to the reviewing court when the new circumstances involve a change in law rather than facts. When the decree in this case was originally made, union shop agreements were prohibited by the Railway Labor Act and thus constituted in themselves a form of statutorily forbidden discrimination. Congress has since, in the clearest terms, legislated that bargaining for and the existence of a union shop contract, satisfying the conditions provided in § 2 Eleventh of the Railway Labor Act, are not forbidden discriminations by union or employer. Congress has therefore determined that whatever ways such a union shop arrangement facilitates other, unauthorized discriminations must be borne as inescapable incidents of a legislatively approved contract term.

Had the 1945 decree simply represented relief awarded by the District Court after a trial of the action instituted by petitioners, there could be little doubt but that, faced with the 1951 amendment to the Railway Labor Act, it would have been improvident for the court to continue in effect this provision of the injunction prohibiting a union shop agreement as being unlawful *per se,* or its use as an instrument to effectuate other statutorily forbidden discriminations. That provision was well enough under the earlier Railway Labor Act, but to continue it after the 1951 amendment would be to render protection in no way authorized by the needs of safeguarding statutory rights at the expense of a privilege denied and deniable to no other union. This conclusion would not be affected by the circumstance, which the District Court here found, that the unions' hostility to nonunion employees still continued, for any discriminations that might be facilitated

by the union shop clause have been legislatively determined to be an expense more than offset by the benefits of such a provision.

What seems plain to us in reason, as to a litigated decree, is amply supported by precedent. In *Pennsylvania* v. *Wheeling & Belmont Bridge Co., supra,* this Court was also required to deal with the effect upon an outstanding injunction of subsequent congressional action. The Court had earlier held that a bridge across the Ohio River obstructed navigation in such a way as to be in conflict with certain Acts of Congress regulating navigation on the river. The decree "directed that the obstruction be removed, either by elevating the bridge to a height designated, or by abatement." 18 How., at 429. A later Act of Congress declared the bridge to be a lawful structure in its existing position and elevation. The injunction was dissolved, the Court saying, 18 How., at 430–432:

> "So far, therefore, as this bridge created an obstruction to the free navigation of the river, in view of the previous acts of congress, they are to be regarded as modified by this subsequent legislation; and, although it still may be an obstruction in fact, is not so in the contemplation of law. . . . But that part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance. Now, whether it is a future existing or continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the mean time, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot

be enforced. There is no longer any interference with the enjoyment of the public right inconsistent with law, no more than there would be where the plaintiff himself had consented to it, after the rendition of the decree. Suppose the decree had been executed, and after that the passage of the law in question, can it be doubted but that the defendants would have had a right to reconstruct it? And is it not equally clear that the right to maintain it, if not abated, existed from the moment of the enactment?"

The principles of the *Wheeling Bridge* case have repeatedly been followed by lower federal and state courts.[6] We find no reason to recede from them.

That it would be an abuse of discretion to deny a modification of the present injunction if it had not resulted from a consent decree we regard as established. Is this result affected by the fact that we are dealing with a consent decree? Again we start with the *Swift* case, *supra,* where the Court held, at pp. 114–115:

"The result is all one whether the decree has been entered after litigation or by consent. . . . In either

---

[6] In *McGrath* v. *Potash,* 91 U. S. App. D. C. 94, 199 F. 2d 166, after Congress passed a statute excluding from the requirements of the Administrative Procedure Act deportation proceedings, the District of Columbia Circuit vacated an injunction against the Government requiring compliance with that Act. There are many cases where a mere change in decisional law has been held to justify modification of an outstanding injunction. *E. g., Ladner* v. *Siegel,* 298 Pa. 487, 148 A. 699 (whether a garage in a residential district is a nuisance); *Santa Rita Oil Co.* v. *State Board of Equalization,* 112 Mont. 359, 116 P. 2d 1012 (what federal instrumentalities are exempt from state taxation); *Coca-Cola Co.* v. *Standard Bottling Co.,* 138 F. 2d 788 (whether the use of the word "cola" infringed Coca-Cola's trademark); and see *Western Union Tel. Co.* v. *International Brotherhood,* 133 F. 2d 955 (whether ordinary strikes are forbidden by the Sherman Act and what picketing can constitutionally be enjoined).

event, a court does not abdicate its power to revoke or modify its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong. We reject the argument for the interveners that a decree entered upon consent is to be treated as a contract and not as a judicial act. . . . But in truth what was then adjudged was not a contract as to any one. The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be."

This Court has never departed from that general rule.[7] We continue to adhere to it because of the policy it expresses. The parties cannot, by giving each other consideration, purchase from a court of equity a continuing injunction. In a case like this the District Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce. Frequently of course the terms arrived at by the parties are accepted without change by the adopting court. But just as the adopting court is free to reject agreed-upon terms as not in furtherance of statutory objectives, so must it be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives. In short, it was the Railway Labor Act, and only incidentally the parties, that the District Court served in entering the consent decree now before us. The court must be free to continue to further the objectives of that Act when its provisions are amended.

[7] In *Coca-Cola Co.* v. *Standard Bottling Co.*, 138 F. 2d 788, 790, a Circuit Court could say with some certainty: "We know of no case which holds that a consent decree imposing a continuing injunction deprives the court of its supervisory jurisdiction in the matter."

The parties have no power to require of the court continuing enforcement of rights the statute no longer gives.

The record leaves no room for doubt that the parties in fact attempted to conform the consent decree to the dictates of the Railway Labor Act as it then read. We can attach no weight to either of the two factors that led the lower courts to find that the parties had bargained, free of the requirements of the Act, for an injunction serving only their own interests. The first factor—that an independently arrived at contract rather than a decree effectuating rights accorded by the Act must have been contemplated because the unions agreed to equitable relief when their acts were already declared unlawful by statute—ignores completely the fact that this was precisely the relief sought in the complaint filed by the 28 plaintiffs and the relief that had been granted after litigation in *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, and in *Graham* v. *Brotherhood of Firemen,* 338 U. S. 232. The second factor—that the unions agreed to be bound as to bargaining agreements that might later be in effect as well as the contract then in effect—ignores the fact that the parties, in all likelihood, meant only to cover any later bargaining agreements under the Act *as it read at the time of the consent decree.*[8]

The type of decree the parties bargained for is the same as the only type of decree a court can properly grant—one with all those strengths and infirmities of any litigated decree which arise out of the fact that the court will not continue to exercise its powers thereunder when a change in law or facts has made inequitable what was once equitable. The parties could not become the conscience

---

[8] We consider unpersuasive the argument of the railroad that in 1945 there was already on foot a movement to amend the Railway Labor Act so as to permit union shop agreements.

of the equity court and decide for it once and for all what was equitable and what was not, because the court was not acting to enforce a promise but to enforce a statute.

The judgment of the Court of Appeals must be reversed, and the case remanded to it for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE FRANK-FURTER and MR. JUSTICE WHITTAKER concur, dissenting in part.

This controversy commenced in 1945 prior to the time when so-called union shop agreements were authorized by Congress. Act of Jan. 10, 1951, 64 Stat. 1238, 45 U. S. C. § 152 Eleventh. Since the date of that law, which we upheld in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, employees and carriers *may* negotiate that type of agreement, though they are not required to do so. *Id.,* p. 231. Prior to that date, however, a union shop was barred by law in this industry; and a union that discriminated against nonunion members was accountable to them. See *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 207.

Twenty-eight nonunion members sued petitioners, in 1945, claiming damages in the amount of $140,000. The complaint purported to state a class action. But the case never came to trial. A settlement was reached which provided for (a) the payment of $5,000 in cash; (b) the waiver and release by the 28 plaintiffs of all their claims; and (c) a consent decree which would protect "the undersigned" against future acts of discrimination by petitioners.

The consent decree did not purport to protect *future* employees. By its terms it protected only "the plaintiffs in this action and all other employes of the defendant Railroad employed in" designated crafts or classes and not members of the union. The petitioners agreed to refrain from discriminating "against the plaintiffs and the classes represented by them."

I do not think the consent decree, read in light of the settlement, did more than settle claims of *then-existing employees.* Employees hired in the future were, by its terms, not included. Yet apparently a host of them have intervened, seeking the protection of the *status quo* created by that decree. I use the word "apparently" because the record does not show which intervenors were on the payroll of the carrier in 1945. Those who became employed after that date plainly are not entitled to the protection of the decree. Of those who were employed at that time, we know that some are still employed. Of the latter group, at least seven of the original 28 employees are still on the payroll. These seven released valuable claims for settling their disputes. It is harsh and unjust to deprive them of those fruits of the settlement. Whether there are others employed in 1945 who have a like claim to fair dealing is impossible to tell from the record.

We are all agreed that there is power in the District Court to modify the consent decree, whether or not the power to modify was reserved. *United States* v. *Swift & Co.,* 286 U. S. 106, 114. I agree with the Court that the union should not be disabled by that decree from carrying out the new union shop policy which Congress has made permissive. Cf. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421, 435–436. Certainly all employees who have joined the ranks since 1945 have no claim to its protection, as they are not included in its

terms and gave nothing up in exchange for it. To construe it to include them would as a result of changing circumstances turn the consent decree "into an instrument of wrong." *United States* v. *Swift & Co., supra,* 115. But when we set aside the decree as respects those who gave up something of value to get it, we do an injustice. I think the applicable principle is stated in *United States* v. *Swift & Co., supra,* 119: "The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making."