Jouett E. ARNEY, et al., Plaintiffs,

v.

Governor Joan FINNEY, et al., Defendants.

No. 77–3045–R.

United States District Court, D. Kansas.

May 17, 1991.

---

**3.** Equitable's brief does not expressly address this issue.

Roger M. Theis, Ayesh, Docking, Herd & Theis, Wichita, Kan., William J. Rich, Michael Kaye, Lisa Nathanson, Stephen W. Kessler, Topeka, Kan., Dwight A. Corrin, Corrin & Krysl, Wichita, Kan., for plaintiffs.

Carol R. Bonebrake, Wayne T. Stratton, Goodell, Stratton, Edmonds & Palmer, Charles E. Simmons, Timothy G. Madden, Kansas Dept. of Corrections, Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This case is now before the court upon the motion of defendants to modify a prior order of this court dated April 13, 1989 by enlarging the designated operating capacities at four housing units in the state prison system. The court has issued a tentative order in reaction to the instant motion and solicited reaction from members of the plaintiffs' class. Two hearings have been conducted on this matter, and the court is now prepared to rule. The court shall grant the motion in part and deny the motion in part as further detailed in this opinion.

Some background discussion of this case is necessary in this matter. Prior to issuing the court's order of April 13, 1989, the court heard evidence regarding conditions of confinement at prison facilities in Lansing and Hutchinson, Kansas. The follow-

ing directives were part of the court's order:

—Double-celling may occur in the medium security unit at KSP [Lansing] but shall not extend beyond July 1, 1991.

—"outside dormitories" (R & S units) at Kansas State Penitentiary [Lansing] shall not be used to house inmates after July 1, 1991.

—Prior to July 1, 1991, the inmate population at other institutions operated by the Department of Corrections shall not exceed the operating capacity of those institutions or the "maximum capacity" of each institution as defined by the Department of Corrections 1986 Capacity Report, whichever is greater.

—A population management system which assures that the Kansas inmate population remains within the operating capacity of the state's correctional institutions shall be in effective operation no later than July 1, 1991. No facility shall be permitted to operate with a population beyond its operating capacity after that date. In the event that the population of any institution exceeds the established operating capacity, immediate notice shall be given to the Court. The State shall then be permitted thirty days in which to reduce the population to its operating capacity. If the State fails to reduce the population within that time, then inmates shall be released or transferred as needed to restore the institution to its operating capacity. Inmates shall not be transferred to another facility in order to restore an institution to its operating capacity if such a transfer would cause another facility to exceed its operating capacity.... No increase in operating capacity ... shall be permitted without agreement of the parties or approval from the court.

—Modification of this Order shall only be permitted by agreement of the parties or by order of the Court on the basis of a clear showing of a grievous wrong evoked by new and unforeseen conditions or for failure to meet the objectives of providing relief from unconstitutional conditions of confinement. Lack of funds shall not be considered new or unforeseen conditions.

—Except for the population limits imposed in this Order, this case shall be closed six months after defendants' compliance with the terms of the order and obtaining accreditation at KSP, KSIR, and KCIL per ACA and NCCHC Standards.

—Although the Court has not disposed of the entire litigation, relief described in this order shall be considered final, and the Court therefore makes an express determination that there is no just reason for delay, and also makes an express direction for the entry of judgment as required under Rule 54(b) of the Federal Rules of Civil Procedure.

The purpose of the April 13, 1989 order was to eliminate conditions of confinement at Lansing and Hutchinson which violated the Constitution and a consent decree regarding prison conditions at Lansing. Operating capacities were established at all facilities in the Kansas prison system to prevent defendants from "solving" the problems at Lansing and Hutchinson by overcrowding other prison facilities in the state.

Since the April 13, 1989 order was filed, the court has entered four orders which have enlarged the operating capacities of certain facilities referred to in the April 13, 1989 order. The court has also entered orders which have lowered the operating capacity of some facilities or deleted facilities from consideration because defendants no longer used them. In most instances, operating capacities have been enlarged when additional space was acquired, renovated, or redesignated to house prisoners. Recently, to accommodate new building and renovation needs, small increases in the operating capacity at Lansing and the El Dorado Correctional Work Facility have been permitted on a temporary basis. In contrast to the intent of the instant motion, no modifications in operating capacities have been allowed in the past which would cause double-celling after a deadline the court has imposed for the end of double-celling, or which would permit housing in a

facility after the deadline for closing that facility.

Defendants request the court to take the following actions: 1) permit double celling on an "as necessary basis" until October 31, 1991 in up to half of the cells at the K, L and M medium security units at Lansing; [1] 2) permit continued utilization of the R & S units at Lansing on an "as necessary basis" for a period of two years with a reduction of the overall operating capacity of the units to 120 inmates; 3) increase the designated operating capacity of the Topeka Correctional Facility from 180 to 320; and 4) increase the designated operating capacity at the Ellsworth Correctional Facility from 516 to 584.

The first two actions requested by defendants would alter the court's specific directions in the April 13, 1989 order that double-celling end in the medium security unit at Lansing after July 1, 1991, and that the R & S units be closed as of the same date. The last two actions requested by defendants are a matter of altering operating capacities at two facilities about which the court has not heard evidence.

■ Contrary to the protests of some members of the plaintiffs' class, this is not a situation in which the doctrine of *res judicata* bars the court from altering the terms of the April 13, 1989 order. The Supreme Court has stated:

> There is ... no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtained at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief. Firmness and stability must no doubt be attributed to continuing injunctive relief based on adjudicated facts and law, and neither the plaintiff nor the court should

be subjected to the unnecessary burden of reestablishing what has once been decided. Nevertheless, the court cannot be required to disregard significant changes in law or facts if it is "satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *United States v. Swift & Co., supra,* [286 U.S. 106] at 114–115 [52 S.Ct. 460, 462, 76 L.Ed. 999 (1932)]. A balance must thus be struck between the policies of *res judicata* and the right of the court to apply modified measures to changed circumstances.

*System Federation v. Wright,* 364 U.S. 642, 647–48, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). "Changed circumstances" usually entails changes in the law or facts. But, the power of equity to modify an injunctive decree also has been extended to situations "where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *King–Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31, 35 (2d Cir.1969). This has been considered especially appropriate in institutional-reform litigation. *New York State Ass'n for Retarded Children v. Parisi,* 706 F.2d 956, 969 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). Injunctions may even be terminated when the purposes of the litigation have been achieved. This is illustrated by the recent Supreme Court case of *Board of Education v. Dowell,* — U.S. —, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), where the Court held a finding that the purposes of a school desegregation injunction had been fully achieved would be sufficient, and no "additional showing of 'grievous wrong evoked by new and unforeseen conditions'" was required, to modify or terminate the injunction. At —, 111 S.Ct. at 636.

The analogy to school desegregation litigation is apt because in this case, as in school desegregation litigation, the court must be sensitive to the limited powers and limited expertise which a federal court has

---

1. Originally, defendants requested permission to double-cell *all* of the cells in the K, L and M units. This request has been scaled back to half of the cells in a post-hearing memorandum.

to deal with matters normally delegated to state and local administrators. The legal justification for the court's actions are the violation of the Constitution and the prior consent decree in this case. Modifying this court's prior injunctive order, if such an alteration does not result in a constitutional violation or violation of the prior consent decree, may be appropriate in recognition of the caution federal courts should exercise before imposing their ideas of prison administration upon state prison officials. See *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); see also, *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir.1985). There may be more than one way to satisfy the legitimate objectives of this litigation, and changing circumstances may dictate a flexible approach to maintaining satisfactory conditions of confinement. With this in mind, the court shall examine each of the four proposed modifications in the court's order of April 13, 1989.

■ *K, L, & M units.* Defendants seek to modify the court's prior order to permit double-celling in half of the cells in the K, L and M units at Lansing on an as needed basis until the new El Dorado facility is fully operational or October 31, 1991, whichever is earlier. Defendants further state that they will screen inmates to determine suitability for double-celling and consider inmate input in this process, including the smoking and non-smoking desires of inmates. In support of this measure, defendants argue that they have worked in good faith to comply with the court's order. They claim that the delay in completing the El Dorado prison has been unavoidable and requires postponing for a few months the deadline for the end of double-celling in the K, L and M units.

Plaintiffs contend that the end of double-celling at K, L and M units is at the core of this litigation. Plaintiffs assert that conditions have not improved significantly for inmates double-celled at these units since this litigation was revived in 1988. Plaintiffs further argue that various measures for population control, movement or reduction exist which could alleviate the need to continue double-celling at K, L and M units. These measures include furlough, parole and pardon. In this connection, plaintiffs note that one of the mandates of the April 13, 1989 order was that defendants develop a population management system no later than July 1, 1991 to maintain prison populations within the operating capacities of the prison facilities.

The court believes defendants have been working in good faith to fulfill the requirements of the court's orders in this litigation. But such good faith cannot excuse noncompliance with a long-established requirement which the court believes is at the heart of this litigation. To modify this part of the court's April 13, 1989 order strikes at the reasons for the order.

If the public would be endangered without continued double-celling at the K, L and M units, this could be considered a showing of "grievous wrong" justifying modification of the court's prior order. But, there has been no substantial evidence presented to the court of a threat to the public if the court enforces the prohibition against double-celling at the K, L and M units. First, it is not clear whether defendants will actually need to double-cell inmates at K, L and M units after July 1, 1991, even if the El Dorado prison is not completely operational by that time. Defendants are asking for permission to double-cell in case the prison population increases. This may or may not happen, and it is something which population control measures should be designed to control. Second, currently there are minimum security inmates being housed in medium security cells at Lansing. If these inmates could be moved to surplus minimum security beds, room would be opened for more medium security inmates at Lansing. We are unaware of any problems from or obstacles to such a transfer as an alternative to continued double-celling. Finally, assuming the end of double-celling at K, L and M units would require a release of some prisoners until the El Dorado prison is fully operational, we have no evidence that a substantial danger to society would be created by such a release.

For the above-stated reasons, the court shall not modify its previous order to permit double-celling at K, L and M units after July 1, 1991.

■ *R and S units.* Under the court's April 13, 1989 order, the R and S units are not to be used to house inmates after July 1, 1991. Currently, these units are being used to "house" a small number of inmates on a "sleep-out" status. Defendants seek permission to continue to use the units to house inmates on an as needed basis for two years so that the Department of Corrections will have flexibility in meeting maintenance requirements at Lansing, as well as the inmate population requirements of the State.

Defendants have represented, without substantial opposition, that conditions have significantly improved at the R and S units over the past two years. Defendants assert that inspections by various officials and an expert retained by plaintiffs have determined the conditions at R and S are satisfactory for habitation if the operating capacity of the units is limited to 120 inmates.

Plaintiffs assert that there are chronic maintenance problems and problems with access to health care and other services which make the R and S units less suitable for housing than other facilities.

If the conditions at the R and S units have improved significantly to the point that they are clearly within constitutional norms, then the purposes of this litigation are not served by requiring that the units be closed. Furthermore, use of the R and S units for short-term housing or sleep-over accommodations may not undermine the purposes of the April 13, 1989 order. Defendants have the obligation of substantiating the improvement in conditions at the R and S units and of clarifying any time parameters which they may intend to place on inmates being housed at R and S. While there may not be a significant dispute as to the current conditions at the R and S units, the court is unwilling to alter a previous order without a more formal presentation of evidence. Therefore, the court shall deny permission to house inmates at the R and S units until evidence has been presented demonstrating that the conditions of confinement at the R and S units will satisfy constitutional requirements. Defendants may contact the court to schedule a hearing for this matter.

■ *Topeka Correctional Facility.* This facility was not a focal point of this litigation. The court has no reason to believe that the proposed renovations and increased operating capacity will interfere with the purposes of this litigation or that defendants are simply shifting unconstitutional conditions of confinement from one facility to the Topeka Correctional Facility. Therefore, the court shall grant the proposed increase in the operating capacity of the Topeka Correctional Facility–Central Unit from 180 to 320 inmates. This modification in the court's order of April 13, 1989 is conditioned upon the following provisions: 1) the increase is authorized only after defendants complete necessary renovations regarding additional toilet and shower facilities consistent with the standards of the American Correctional Association; 2) inmate preference in double-celling will be considered, subject to security, classification, and other legitimate penalogical considerations; 3) inmates will be screened regarding suitability for double-celling, and inmate input shall be considered; 4) non-smoking inmates will not be assigned to cell with inmates who smoke if the non-smoking inmate objects to the assignment; and 5) representatives for plaintiffs shall be granted appropriate access to the facility to monitor the renovation of facilities and access to programs.

■ *Ellsworth Correctional Facility.* Defendants propose to enlarge the operating capacity at this facility from 516 to 584 by redesignating 68 cells from maximum to medium custody and then double-celling those cells. Currently, 352 inmates are double-celled at this facility.

Once again, the Ellsworth prison has not been a focal point in this case. The court's main concern has been that the conditions at this facility not be made unconstitutional because of steps taken to improve condi-

tions at Lansing and Hutchinson. But, the court also questions whether chances for accreditation at Ellsworth should be sacrificed in order to achieve accreditation at Lansing or Hutchinson. The court has not heard evidence regarding conditions at Ellsworth, however. Therefore, the court is not in a position to conclude one way or another how conditions at Ellsworth will be affected by the proposed changes. Under these circumstances, the court shall grant the proposed enlargement of the operating capacity at Ellsworth until July 1, 1992. Prior to that date, the court shall further inquire about the conditions at Ellsworth to determine whether the enlargement of the operating capacity should be continued. This temporary enlargement is granted upon the condition that double-celled inmates not have more than ten hours of "in-cell" time during each twenty-four hour day and that time available for use of the gymnasium and recreation yard is not dimnished. It is also a condition of this order that defendants continue to screen inmates and consider inmate input regarding suitability for double-celling with other specific inmates. But, housing assignments shall remain at the discretion of defendants.

*Other aspects of the tentative order.* The tentative order issued by the court also addressed procedures for approval of future renovation and construction. These procedures are hereby approved and made part of this court's orders in this litigation. Additionally, the operating capacity of the El Dorado Correctional Facility is hereby established as 610.

*Miscellaneous pleadings.* A number of other pleadings have been filed in recent months which the court shall address at this time. These pleadings have been filed by persons other than counsel for plaintiffs or defendants. As the court has stated on other occasions in this litigation (e.g., Doc. No. 306), the court must rely upon counsel for plaintiffs to represent the class and to bring relevant matters to the court's attention on behalf of the class. The confusion and repetition which would be created by individual members of the class raising their own complaints was one of the rea-

sons for certifying this matter as a class action. Although the court has permitted various documents authored by individual class members to be filed in this case, this does not mean that individual class members, even named plaintiffs such as Mr. Arney, are at liberty to act as lawyers for the class or to pursue individual claims unrelated to the class. Some of the relief requested in the below-mentioned pleadings must be denied on this basis.

Some of the pleadings which have been filed address directly or indirectly the adequacy of plaintiffs' representation by counsel. The court made some comments regarding this issue during the last hearing in this case. We shall repeat or elaborate upon those comments now.

Plaintiffs are being effectively and vigorously represented by counsel who have a good knowledge of the law and long experience with the particular facts of this case. Throughout the history of this case and in recent months, counsel have competently related plaintiffs' viewpoint regarding the issues in this case. The court believes it is in a good position to make this judgment since the court has also reviewed hundreds of inmate letters involving the issues in this case. This case cannot proceed as a class action without counsel being appointed to represent the class. This court is responsible for seeing that the class is receiving vigorous and competent representation. *Key v. Gillette Co.*, 782 F.2d 5, 7 (1st Cir.1986). The court is convinced that plaintiffs' interests would not be served by the termination of appointed counsel or by the appointment of different counsel. There has been absolutely no evidence that plaintiffs' interests are being unduly compromised by counsel or that there is a legitimate conflict of interest between counsel and the class or between different factions of the class.

With the above comments in mind, the court makes the following rulings upon various pleadings filed in this case.

Nos. 323, 347 and 349—Motions for temporary restraining order and hearing. These motions shall be denied. These mo-

tions contain issues which must be raised through counsel to the extent they are relevant to the claims of the class. Individual claims of retaliation should be raised in separate litigation.

No. 325—Motion to terminate Case No. 77–3045. This motion shall be denied.

No. 327—Notice of termination. This pleading, treated as a motion to terminate counsel, shall be denied.

No. 339—Motion for intervention. Movants have failed to demonstrate or sufficiently allege that their interests are not being adequately represented by existing counsel and parties to this action. Therefore, the motion shall be denied.

No. 341—Motion for intervention, investigation and foreclosure. This motion does not present good cause for intervention or the other relief requested. The motion shall be denied.

No. 344—Motion for certification of questions. The court is unaware of a procedure for certifying questions from a district court to a Supreme Court Justice. In any event, the court does not believe this action should be taken. The motion is denied.

No. 322—Motion to withdraw as class representative. Mr. Jouett Arney has requested leave to withdraw as a class representative in this case. There is no opposition to the motion. This motion shall be granted.

Finally, one issue which was raised in the last hearing in this case and which is also the subject of an individual filing by a class member (No. 343) is a recent regulation by the Department of Corrections which limits the property which inmates can move from one institution to another when those inmates are transferred. These limits include restrictions upon the transfer of typewriters. The court does not believe this is a matter which falls within the subject area of this case. It is not a matter related to the Eighth Amendment of the Constitution or connected to previous orders in this case. Therefore, the court shall take no action regarding this regulation.

In conclusion, defendants are denied permission to continue double-celling at K, L and M units after July 1, 1991. Defendants are denied permission to continue to house inmates in R and S units after July 1, 1991. This decision may be reconsidered, however, upon sufficient evidence relating to the conditions of confinement in those units. Defendants are granted permission to enlarge the operating capacity at the Topeka Correctional Facility—Central Unit under the conditions set out in this order. Defendants are also granted temporary permission to enlarge the operating capacity at the Ellsworth Correctional Facility under conditions set out in this order and with the understanding that further inquiry shall be made of conditions at that facility before the enlargement is made permanent. Other motions for termination of this action, termination of counsel, temporary restraining orders, a cease and desist order regarding restrictions upon the transfer of property, intervention, and certification of questions are hereby denied. The motion of Mr. Jouett Arney to withdraw as a named class representative is granted.

IT IS SO ORDERED.