[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13558

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22, 2011
JOHN LEY
CLERK

D.C. Docket No. 2:96-md-01130-MEF

IN RE: CONSOLIDATED 'NON-FILING INSURANCE' FEE LITIGATION,

PRINCESS NOBELS,
DOROTHY MCCOY, et al.,

                                        Plaintiffs - Appellees,

   versus

SECURITY FINANCE CORP. OF GEORGIA,

                                        Movant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(June 22, 2011)

Before CARNES and PRYOR, Circuit Judges, and SEITZ,[*] District Judge.

SEITZ, District Judge:

_____

   [*]Honorable Patricia A. Seitz, United States District Judge for the Southern District of
Florida, sitting by designation.

Appellant, Security Finance of Georgia, LLC[1] and its thirty-three related entities,[2] believe that the grass is greener on the other side of the fence – $5 million per year greener. The "fence" keeping Security Finance from all of this greenery is a permanent injunction that it agreed to more than ten years ago as part of a settlement between Security Finance and Plaintiffs. Security Finance sought to tear down the fence by asking the district court below to dissolve the injunction. The district court denied the motion, as well as the subsequent motion for reconsideration and Security Finance appealed. Security Finance asserts that the district court abused its discretion by failing to follow this Court's decision in *Christ v. Beneficial Corp.*, 547 F.3d 1292 (11th Cir. 2008). Because we find that the lower court did not abuse its discretion, we affirm.

## I. FACTUAL BACKGROUND

The Security Finance case and the *Christ* case were two of approximately thirty-five cases which were ultimately consolidated for pretrial purposes in the multi-district litigation styled: *In Re: Consolidated "Non-Filing Insurance" Fee Litigation*. The consumer Plaintiffs contended that the defendants – consumer

---

[1]Security Finance of Georgia, LLC is a successor to Security Finance Corporation of Georgia.

[2]Throughout this opinion, the Court will use the name "Security Finance" to refer to Appellant, as well as its related entities which were parties to this action.

2

finance companies and insurance companies – engaged in predatory lending practices in violation of the Truth in Lending Act (TILA) by using "non-filing insurance"[3] schemes to exact unlawful loan charges from consumers. Plaintiffs alleged the defendants charged unlawful interest on the allegedly unlawful charges and collected fees for "non-filing insurance" that either did not exist or, at best, were fees for general default insurance or self-insurance against default.

A. The Litigation Process and Settlement

The case against Security Finance began in 1994, when Security Finance was sued not only for violations of TILA and the Racketeer Influence and Corrupt Organizations Act (RICO), but also for fraud and breach of contract. The litigation was long, extensive and hard fought. In August 1995, Plaintiffs moved to certify the class of consumer borrowers as either an injunctive class or as a hybrid class because they were seeking damages as well as injunctive relief. Other cases involving Security Finances' competitors were added to the MDL and consolidated for all pretrial proceedings. In December 1997, Plaintiffs filed a Consolidated Amended and Recast Class Action Complaint.

---

[3]Non-filing insurance is insurance that a lender buys to save the cost of filing a UCC-1, under Article 9 of the Uniform Commercial Code. It is not general default insurance, which is insurance that protects the lender against the borrower's default or other credit loss.

The following May, Plaintiffs moved for partial summary judgment. Security Finance opposed the motion. Accompanying Plaintiffs' motion were a comprehensive supporting memorandum of law and evidentiary submissions that detailed the evidentiary bases for their claims. Specifically, Plaintiffs proffered that in at least fifteen states Security Finance used two schemes, one through a captive corporation and the other a reinsurance program using the captive corporation and an independent insurer, to violate TILA by charging blanket premium rates for non-filing insurance when the fee charged was not to buy non-filing insurance but merely to create a pool against bad debts. In addition to charging the fee, Plaintiffs submitted that Security Finance also charged interest on the fee.

While the summary judgment motion was pending, settlements began to occur. On June 12, 1998, the district court approved the settlement with the first group of defendants. Thereafter, on March 12, 1999, the court approved settlements with two more groups of defendants. All three of these settlements resulted in entry of consent judgments that contained six-year injunctions limiting these defendants' ability to charge customers for non-filing insurance.[4]

---

[4]The injunctions included specific parameters relating to the settling defendants' non-filing insurance programs.

After nearly five years of litigation and extensive settlement negotiations, Security Finance and Plaintiffs also reached a settlement agreement. Security Finance agreed to settle "for business reasons, to avoid the risk and continuing expense of litigation." Unlike the earlier settlements involving six-year injunctions, the settlement between Plaintiffs and Security Finance included an injunction to "permanently prevent" Security Finance from charging any fees or premiums for non-filing insurance in the future. It is noteworthy that two years earlier Security Finance made the business decision to discontinue all of its non-filing insurance programs. In addition to the injunction and the explicit recognition of no admission of liability, the settlement also required certification of a damage class under Federal Rule of Civil Procedure 23(b)(3), the payment of $7.7 million in damages to the class, and dismissal of the conspiracy claims upon the court's approval of the settlement.

Because the claims against Security Finance were class action claims, the district court was required to approve the parties' settlement. *See* Fed. R. Civ. P. 23(e). On February 9, 1999, the district court gave preliminary approval to the settlement. On July 15, 1999, the court entered its Final Judgment, Approval of Class Action Settlement and Dismissal with Prejudice of the Security Finance Entities. The district court found the settlement agreement was "fair, adequate and

5

reasonable," the result of adversarial and hard-fought negotiations by the parties, and would "avoid[] complex, expensive and prolonged litigation which could have inured to the disadvantage of all parties and the Court."

B.  The *Christ v. Beneficial* Litigation

Although the *Christ* defendants were added to the MDL in 1998, they chose not to settle.  Thus, after granting the plaintiff class summary judgment on liability in 2002, the MDL court remanded the *Christ* case to the Middle District of Florida.  In 2006, after a bench trial on damages, the district court awarded plaintiffs injunctive relief under the Declaratory Judgment Act and over $22,000,000 in restitution and disgorgement for violations of TILA.

On appeal, this Court, in *Christ v. Beneficial Corp.*, 547 F.3d 1292 (11th Cir. 2008), addressed, for the first time, the scope of relief available to private litigants under TILA and held that private litigants' relief was limited to actual damages, statutory damages, attorney's fees and costs.  Thus, *Christ* made clear that injunctive relief is not available under TILA for private litigants.

C. Security Finance's Motion to Modify

On September 8, 2009, pursuant to Federal Rule of Civil Procedure 60(b)(5), Security Finance moved to modify the settlement agreement and final judgment arguing that the *Christ* decision constituted a significant change in legal circumstances, which required a modification of the consent decree's injunction. Security Finance also asserted that the injunction was a hindrance to its ability to operate its business and to compete. To support its position, Security Finance filed the eight paragraph affidavit of Ray Biggs, which made similar assertions but did not provide any factual details to support the conclusory statements.[5] While

---

[5]The relevant portions of the Biggs Affidavit state:

4. Since the entry of the Final Judgment in this case ten years ago, the Company has not purchased the product described in the litigation as "non-file insurance" and, likewise, has not charged a fee to customers for this product. Under the permanent injunction entered by the court, the Company is prohibited from doing so, regardless of the manner in which the product was described or disclosed by the Company to its customers.
5. Due to the relatively small size of the loans made by the Company, which are less than $1,500.00, and the nature of the collateral securing the loans (personal property that is often difficult to locate when the debtor fails to pay a loan), the Company's profitability depends on simplicity. The use of non-file insurance would, for example, allow the Company to avoid the more complicated process of perfecting a lien on the personal property, allow the Company to avoid participation in bankruptcy proceedings by relying on the non-file insurance, and help offset clerical costs incurred by the Company in connection with non-performing loans.
6. During the last ten years, the Company's competitors have continued to purchase "non-file insurance" and to charge a fee to their customers for the product, and the Company's competitors apparently have the right to continue to do so in the future.
7. The permanent injunction imposed by the Court necessarily places the

Plaintiffs opposed the motion, they did not file any opposing affidavits; they directed the district court to their evidentiary support for their motion for partial summary judgment.

After considering the parties' submissions, the district court applied the test in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), and denied the motion to modify the consent decree because Security Finance had not met its burden. *Rufo*'s two prong test requires the moving party to establish, first, that a significant change in circumstances warrants revision of the decree and, second, that the proposed modification is suitably tailored to the changed circumstance. Because the district court found that Security Finance had not established the first prong of the *Rufo* test, the district court determined it did not need to reach the second prong.

In applying the first prong of the *Rufo* test, the district court found that Security Finance had not carried its burden to establish that factual or legal conditions had significantly changed to justify a modification of the consent decree. The district court also concluded that *Christ* constituted a clarification of,

Company at a competitive disadvantage that hinders the company's ability to compete in its line of business and to operate its business.
8. Amending the permanent injunction in this case to allow the Company to use "non-file insurance" would give the Company the same rights shared by its competitors with respect to "non-file insurance."

rather than a change in, the law and that Security Finance had not met its burden to establish that the parties entered into the consent decree with a misunderstanding of the law.

Security Finance then moved to alter or amend the judgment, pursuant to Federal Rule of Civil Procedure 59, and attached to its new motion the Supplemental Affidavit of Ray Biggs. The new affidavit stated that Security Finance would not have entered into the consent decree had it known that TILA did not provide for injunctive relief and that Security Finance was at a competitive disadvantage with major competitors, who do charge for non-filing insurance.[6]

---

[6]The relevant portions of the Supplemental Biggs Affidavit state:

5. At the time the Company agreed to the Final Judgment, the Company had the mistaken belief that the Truth in Lending Act likely provided for injunctive relief as well as restitution and disgorgement.

6. Had the Company not been operating under this mistaken belief, I have no doubt that the Company would not have consented to the Final Judgment and the permanent injunction.

7. The injunctions entered in this MDL against several of the other defendants in the Non-File MDL have expired, such as those relating to World Acceptance Corporation, American Bankers Insurance Group, Inc., The Voyager Group, American Security Insurance Company, and Standard Guaranty Insurance Company.

8. World Acceptance Corporation is one of the Company's major competitors. World Acceptance Corporation is now, and has been for several years, charging its customers for nonfiling insurance.

9. As just one example, World Acceptance Corporation's publicly-filed 10-K report shows that it earned over $5 million in revenue each year between 2007 and 2009 as a result of nonfiling insurance. An excerpt of this 10-K report is attached hereto as Exhibit 1.

10. The permanent injunction imposed by the Court necessarily places the Company at a competitive disadvantage that hinders the Company's ability to

9

The district court denied this motion as well, finding that the supplemental affidavit was also conclusory and unsupported by any evidence. This appeal followed.

## II. THE STANDARD FOR A RULE 60(b)(5) MOTION

Federal Rule of Civil Procedure 60(b)(5) provides that "on a motion and just terms, the court may relieve a party . . . from a[n] order [when] applying it prospectively is no longer equitable." Under this rule, a court applies a flexible standard to determine whether changed circumstances dictate that a consent decree should be modified. *Rufo*, 502 U.S. at 380. However Rule 60(b)(5) was not intended to allow modification simply because "it is no longer convenient to live with the terms of a consent decree." *Id.* at 383. Thus, the party seeking modification bears the burden of establishing that "a *significant* change in circumstances warrants revision of the decree." *Id.* (emphasis added).

In *Rufo*, the Supreme Court set out six types of either changed factual or changed legal circumstances that could warrant modification of a consent decree. The *Rufo* Court held that a significant change in circumstances that warrants modification may be established by showing: (1) changed factual conditions that

compete in its line of business and to operate its business.
11. Amending the permanent injunction in this case to allow the Company to lawfully use nonfiling insurance would give the Company the same rights shared by its competitors with respect to nonfiling insurance.

10

make compliance with the decree substantially more onerous; (2) the decree is unworkable because of unforeseen obstacles; (3) enforcement of the decree without modification would be detrimental to the public interest; (4) one or more of the obligations the decree places upon the parties has become impermissible under federal law; (5) a change in the law has made legal what the decree was designed to prevent; or (6) a clarification of the law, if it can be shown the parties based their agreement on a misunderstanding of the governing law. *Id.* at 384, 388, 390.

Security Finance argues that it is entitled to modification on three of the six bases. First, changed factual circumstances make Security Finance's compliance substantially more onerous. Next, a change in the law makes the obligations placed on Security Finance impermissible under federal law. Finally, in the alternative, Security Finance asserts that the parties entered into the consent decree based on a misunderstanding of the law. However, Security Finance has failed to establish that any of these conditions exist.

## III. SECURITY FINANCE HAS NOT ESTABLISHED A SIGNIFICANT FACTUAL CHANGE

Security Finance maintains that there are changed factual circumstances warranting modification because its present inability to charge customers non-filing insurance fees puts it at a financial disadvantage with its competitors, who

11

are earning $5 million annually by charging such fees.  It argues that the district

court erred in ignoring Security Finance's undisputed evidence of this fact, namely

the first Biggs Affidavit.  While Plaintiffs did not file opposing affidavits, the

Biggs Affidavit was at best conclusions devoid of factual underpinnings.

More importantly, there is simply no factual evidence that the circumstances

have changed from the time Security Finance entered into the consent decree to

when it sought to modify the decree.  Two years prior to agreeing to the consent

decree, Security Finance made the decision to terminate all non-filing insurance

programs nationwide.  Thus, it had made a business decision not to use this

business model before settlement negotiations began.  Moreover, at the time it

agreed to the consent decree, Security Finance knew that several of its competitors

would be able to charge for non-filing insurance in the future.[7]  Furthermore, there

is no evidence to show that Security Finance had any reason to believe that all

consumer lending companies would stop charging for non-filing insurance.

Therefore, at the time Security Finance agreed to the entry of the consent decree,

---

[7]Security Finance argues that the district court applied the wrong standard because it found that it was "foreseeable" that the injunction would have a significant effect on Security Finance's business practices.  However, based on the facts at the time of the agreement, it was more than foreseeable that the injunction would have an effect on Security Finance's business practices and ability to compete because it was a matter of public record that at least three other settlements of MDL cases had injunctions against charging for non-filing insurance that were to last only six years.

Security Finance knew that, at least, some of its competitors would continue to charge for non-filing insurance and that others would be able to charge for non-filing insurance in the not-too-distant future. Thus, to now argue that circumstances have changed and that it is at a competitive disadvantage because it cannot charge non-filing insurance fees appears to be more a case of buyer's remorse than a case of truly changed circumstances.

As previously stated, Rule 60(b)(5) was not intended to allow modification simply because "it is no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 383. While it may be inconvenient for Security Finance to live with its agreement, Security Finance has not met its burden of establishing that *changed* factual conditions make compliance with the consent decree substantially more onerous or that the decree is unworkable because of unforeseen obstacles. Therefore, Security Finance has not met its burden to show significantly changed factual circumstances.

## IV. SECURITY FINANCE HAS NOT SHOWN THAT THERE HAS BEEN A SIGNIFICANT CHANGE IN THE LAW

Security Finance also asserts that *Christ* constitutes a significant change in the law underlying the consent decree and, thus, this change warrants a modification of the consent decree. *Rufo* describes a change in the law justifying a modification of a consent decree as either a change such that "one or more of the

13

obligations placed upon the parties has become impermissible under federal law"

or a change in the statutory or decisional law that "make[s] legal what the decree

was designed to prevent." *See Rufo*, 502 U.S. at 388. Security Finance insists

that, given the *Christ* holding that TILA does not provide injunctive relief as a

remedy for private litigants, the district court lacked the authority to enter the

injunction and the obligations placed on it by the consent decree have become

impermissible under federal law. Security Finance rests its argument primarily on

*System Federation No. 91, Railway Employees Department v. Wright*, 364 U.S.

642 (1961). This reliance on *Wright*, however, is misplaced because *Wright*

involved a situation where the change in the statutory law made legal what the

consent decree was designed to prevent. *Wright* did not involve the situation

where the obligations placed on a party became impermissible, which Security

Finance asserts happened in this case.

In *Wright,* the Supreme Court reversed a lower court decision denying a

motion to modify a consent decree. The *Wright* Court found that intervening

changes to the Railway Labor Act placed the consent decree in direct conflict with

the amended statute because the amendments made legal what the consent decree

was specifically designed to prevent. The consent decree in *Wright* prohibited a

union shop, something that the Railway Labor Act also prohibited at the time of

14

the consent decree.  *Id.* at 644, 645.  Approximately five years later, Congress amended the Railway Labor Act to explicitly permit union shops under certain circumstances and the union sought to modify the consent decree to reflect this change in the law.  *Id.* at 645.  The amendment substantively changed statutory rights, making what was once clearly forbidden, a union shop, now permissible. As a result, the Court held that a consent decree must be modified when a change in the law brings the terms of the decree "in conflict with statutory objectives." *Id.* at 651.  The Supreme Court added that the parties had "no power to require of the court continuing enforcement of rights the statute no longer gives."  *Id.* at 652. Moreover, to continue enforcing the terms of the consent decree that prohibited a union shop would deny a statutory right that was not deniable to any other union and would violate the objectives of the amended statute which, by permitting union shops, no longer required employers to treat union and non-union employees equally.  *Id.* at 648.

The effect of the *Christ* decision on TILA is significantly different in nature than the change to the Railway Labor Act in *Wright.*   *Wright* involved an 180 degree change in what the law allowed.  The *Wright* consent decree directly conflicted with the new law because the decree took away a right that the amended law had expressly created.  Thus, the Railway Labor Act amendment changed the

15

rights created by the statute and one of the statute's objectives; it made legal what the decree, and the prior law, was designed to prevent – unequal treatment of union and non-union employees. The *Christ* decision, however, did not make legal what the consent decree was designed to prevent – allegedly fraudulent lending practices. Nor did *Christ* change the objectives of TILA which are to make consumers aware of the cost of credit, to assure meaningful disclosure of credit terms, and to protect consumers against inaccurate and unfair credit billing. *See* 15 U.S.C. § 1601(a). Thus, *Wright* is inapposite to the case before the Court.

Also, contrary to Security Finance's assertions, *Christ* did not make "one or more of the obligations placed upon the parties . . . impermissible under federal law." Although the consent decree prevents Security Finance from charging its customers fees for non-filing insurance premiums at any time in the future, such an obligation is not in violation of federal law. While TILA does permit a lender to charge customers fees for non-filing insurance premiums, by agreeing to the terms of the consent decree, Security Finance made a conscious decision to give up its right to charge non-filing insurance fees. Security Finance recognized this in the language of the settlement agreement that stated that Security Finance entered into the settlement "for business reasons, to avoid the risk of continuing expense of litigation." Furthermore, such a self-imposed obligation does not do violence to

16

the purposes and objectives of TILA. Thus, the limitation does not place obligations on Security Finance that are impermissible under federal law.

The problem, if any, is the use of the injunction to implement the parties' settlement agreement, not the limitations or obligations the settlement agreement placed on Security Finance. Security Finance argues that based on *Christ* the district court lacked the authority to enter the injunction at the time of the consent decree. However, the Supreme Court has explicitly held that a court has the power to enter a consent decree that grants a form of relief that a court could not have granted had it entered a judgment on the merits. *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986).

In *Local No. 93*, the Supreme Court considered whether a court could enter a consent decree that violated § 706(g) of Title VII. The party arguing that the decree violated § 706(g) asserted that the section's language prohibited a court from entering an order granting relief to individuals who were not themselves victims of discrimination.[8] *Id.* at 518. The Supreme Court held that, regardless of

---

[8]Section 706(g)(2)(A), 42 U.S.C. § 2000e-5(g)(2)(A), states:

No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in

whether § 706(g) actually precludes certain post-trial relief, that provision of the statute does not apply to relief fashioned pursuant to a consent decree.  *Id.* at 515.  The Supreme Court reached this conclusion by examining the nature of consent decrees and contrasting them with judgments entered by a court after a decision on the merits.

The Supreme Court recognized that consent decrees are not treated as judicial decrees in all respects or for all purposes.  *Id.* at 519.  It is "the voluntary nature of a consent decree [that] is its most fundamental characteristic" and "it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all."  *Id.* at 521-22.  The *Local No. 93* Court also noted that consent decrees are the result of careful negotiation between the parties.  *Id.* at 522.  Thus, and most importantly, "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree."  *Id.* at 522.  As a result, a court is not necessarily barred from entering a consent decree that provides broader relief than a court could have awarded after a trial.  *Id.* at 525.  However, a court cannot enter

violation of section 2000e-3(a) of this title.

18

a consent decree that conflicts with or violates the substance or objectives of the statute under which the parties brought suit. *Id.* at 526.

Applying these principles to the consent decree at issue in *Local No. 93*, the Supreme Court found that voluntary agreements which result in consent decrees are not constrained by the limits placed on a court's remedial authority, including the "no order of the court" language in § 706. *Id.* Thus, the Court concluded that "to the extent that the consent decree is not otherwise shown to be unlawful, the court is not barred from entering a consent decree merely because it might lack the authority under § 706(g) to do so after a trial." *Id.* The Court went on to distinguish its situation, where the consent decree included a remedy that a court could not impose after a decision on the merits, from one where the terms of the consent decree conflict with the substance of the underlying statute, such as occurred in *Wright* and *Firefighters Local Union No. 1784 v. Stotts*.[9] *Id.* at 526-28. In distinguishing those cases, the Supreme Court also noted the difference between entry of a consent decree to which all parties agree and entry of a decree

---

[9]The *Stotts* Court reversed a lower court decision that modified a consent decree after a change in factual circumstances not anticipated by the consent decree. 467 U.S. 561 (1984). However, the modification to the decree, which overrode an existing seniority system, conflicted with a section of Title VII, which permits the application of a seniority system absent proof of an intent to discriminate. *Id.* at 577. Thus, the *Stotts* modifications directly conflicted with the statutory objectives and substantive sections of Title VII. *Id.* at 578-81. Furthermore, the modification, which conflicted with a substantive provision of Title VII, was made over the objection of one of the parties to the consent decree. *Id.* at 578.

or a modification to a decree when one or more of the parties objects. *Local No. 93*, 478 U.S. at 528.

If the Supreme Court allowed the entry of the consent decree in *Local No. 93*, given the explicit language of section 706(g) of Title VII, which states that "no order of the court" could require certain relief, clearly the district court in this case had the authority to enter a negotiated injunction that did not conflict with the objectives or substance of TILA. First, the injunction resulted from extensive negotiations between the parties and was agreed to by all parties at the time of its entry. Second, and most importantly, the consent decree does not conflict with the objectives of TILA or violate the substantive provisions of TILA. Thus, while *Christ* would preclude the district court from entertaining an injunction if it had tried the case, under *Local No. 93*, the district court could enter the injunction as part of a consent decree.

## V.  *CHRIST* IS A CLARIFICATION OF THE LAW

As discussed above, the decision in *Christ* was not a substantive change in the law, *i.e.*, one which changed the rights, obligations, or objectives of the law. Instead, the decision clarified what remedies were available to private litigants under TILA. The *Christ* decision simply determined that the language of the statute, while not expressly prohibiting an injunction, did not permit injunctive

20

relief. *Christ* does not state that injunctive relief had once been available and now is not. The issue of injunctive relief had never been addressed expressly by the statute or this Court. *Christ* simply "made clear what the Court had not before announced[.]" *Rufo*, 502 U.S. at 388. Consequently, *Christ* clarified the law. *See id.* at 388-90 (*citing Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 437-38 (1976)).

*Rufo* cautions that not every clarification in the law justifies a modification to a consent decree:

> To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation. . . . While a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it *could* constitute a change in circumstances that would support modification *if* the parties had based their agreement on a misunderstanding of the governing law.

502 U.S. at 389-90 (emphasis added). Thus, the Supreme Court recognized that certain circumstances might justify a modification to a consent decree after a clarification in the law. Before determining if such circumstances justify modification, a court must first determine if the parties based their agreement on a misunderstanding of the law. *Id.*

21

Here, the district court found that Security Finance, as the party seeking modification, failed to meet its burden of showing that the parties had based their agreement on a misunderstanding of the law. The only evidence Security Finance submitted to support a claim that the parties misunderstood the law was the cursory, self-serving Supplemental Biggs Affidavit, which contained no facts to support the affiant's conclusions and was only submitted in support of Security Finance's Rule 59 motion. Furthermore, the Supplemental Biggs Affidavit only addressed Security Finance's misunderstanding of the law; it was silent as to Plaintiffs' understanding of the law. Thus, Security Finance's unilateral approach fell short of its burden to show that the parties misunderstood the law at the time the consent decree was entered.

Security Finance had the burden to point to record evidence to establish that the parties misunderstood the law at the time of their settlement and that such misunderstanding was a factor in the settlement. Because Security Finance failed to meet its burden, the district court was entitled to conclude that there was no mutual misunderstanding of the governing law that could support a modification.

VI.  CONCLUSION

Security Finance, as the moving party, had the burden to establish that a significant change in the law or the factual circumstances justifies modification of

22

the consent decree. Security Finance has not shown that there has been any change in factual circumstances that were not known at the time it agreed to the entry of the consent decree. Nor has Security Finance established that there has been a significant change in the law such that any of the obligations placed upon it have become impermissible under federal law. While the *Christ* decision does constitute a clarification of the law, Security Finance has not met its burden of establishing that the parties entered into the consent decree based on a misunderstanding of the law. Therefore, the district court did not abuse its discretion when it denied Security Finance's Rule 60(b)(5) and Rule 59 motions.

AFFIRMED.